## State of Vermont v. Lee A. Wetherbee

[594 A.2d 390]

No. 89-633

Present: Allen, C.J., Dooley and Morse, JJ., and Peck, J. (Ret.) and Cashman, D.J., Specially Assigned

Opinion Filed May 3, 1991

*Jeffrey L. Amestoy*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Wool, Murdoch & Hughes*, Burlington, for Defendant-Appellant.

**Morse, J.** The principal issue in this appeal from a conviction for lewd or lascivious conduct with a child, 13 V.S.A. § 2602, is whether an examining psychologist's testimony about the child's account of how the crime happened, and who did it, was harmless error. The testimony was an impermissible expert opinion that the child-victim was believable. The error was sufficiently prejudicial to require reversal of the conviction, and accordingly we remand for a new trial.

## I.

Defendant was alleged to have fondled the genitals of his then three-year-old daughter while she was visiting him after her parents' divorce. The State's first witness, a clinical psychologist, testified about symptoms commonly exhibited by child victims of sexual abuse, gave his opinion that the child had

suffered a traumatic experience, and then repeated in detail the child's statements to him as the basis of that opinion.

This set the stage for the child's testimony about how the abuse occurred. Her entire testimony on the incident was less than two transcript pages, consisting of short answers to leading questions posed by the State.

> State: Did anything bad ever happen when you went to visit your Daddy?
> Child: Mm-hmm.
> State: Can you tell me what happened?
>
> . . .
>
> Child: He touched me.
> State: Where did he touch you?
> Child: My bum.
> State: Did you like that?
> Child: No.
>
> . . .
>
> State: When your Daddy touched you, do you remember where you were?
>
> . . .
>
> Child: At his house.
>
> . . .
>
> State: Did you tell your Mommy about what happened?
> Child: Yes.
> State: And why did you tell your Mommy?
> Child: 'Cause it wasn't good.

She was then asked to identify "Daddy" and pointed to defendant.

The remainder of the State's case consisted of testimony by a social worker, who testified that she had investigated the charge and passed on information to the state's attorney, and the child's mother. The mother testified that the child had been "very upset and clinging to [defendant] and looked very scared" when she returned from a visit to defendant's house.

She testified that, a few days later, while giving the child a bath, she discovered that the child's vaginal area was "very red and irritated." She then recounted how the child told her about the alleged abuse.

> I was washing her vaginal area and she said to me: "Mommy don't hurt me.". . . I said: "Who would ever hurt you?" And she said that "Daddy does. . . . Daddy puts his fingers inside my bummy and he hurts me."

Thus, the State's case-in-chief relied upon the sparse testimony of the child, who was three years and ten-and-a-half months old when the abuse allegedly occurred and four years and eleven months old when she testified. That testimony was supplemented with the psychologist's and mother's recounting of the child's story.

Defendant objected to the psychologist's testimony in two pretrial motions and during the course of the trial on the grounds that it constituted inadmissible hearsay. Before the expert's testimony was presented, the court cautioned the jury to restrict the use in their deliberations of the victim's statements to the expert. They were asked to be "very, very, careful" and told to use the testimony for "one purpose, and one purpose only"—as the basis of the expert's opinion—not as evidence of whether the abuse occurred or whether the child was telling the truth. The court concluded the instruction by telling the jury, "I realize it's a difficult task, and it's the kind of thinking we don't normally do every day, but we have to do it here." The State proceeded with questioning:

> State: Doctor, during your clinical interview of [the child], did [she] go on to make any statements to you about problems she had had or was having?
>
> Expert: Yes, she did. . . . I asked if anyone ever hurt you, and she didn't answer but with a nod of her head that looked to me to be yes. I asked her did anyone ever touch you in a not nice way. She was silent there. . . . I asked then about a number of people in the family. Did Daddy ever touch you in a not nice way?
>
> State: Was she able to respond?

Expert: She said, "Yes."

State: What did she tell you?

Expert: ... I asked her ... where had Daddy touched you? She said: "On the bum."

. . .

State: Did she tell you where she was when this happened?

. . .

Expert: It was at the house, her father's house, her daddy's house. May I make a distinction of daddy she uses?

At this point the defense again objected, maintaining that the testimony was going beyond the expert's opinion of whether the victim had been traumatized and instead was focusing on who the perpetrator was. The court allowed questioning to proceed to clarify which father, the genetic father or the stepfather, was being referred to. The testimony continued, and the expert identified defendant as the perpetrator:

State: Dr. Rightmyer, did [the child] identify who Daddy was?

. . .

Expert: Daddy. Daddy was Lee.

The court allowed this testimony despite the State's acknowledgment that its purpose was to clarify the identity of the child's abuser and respond to defendant's reliance on a misidentification defense, that is, that the child had been abused by her stepfather, not defendant.

The child's credibility was the central issue at trial. Several of defendant's relatives testified that the child frequently lied. Defendant's live-in girlfriend stated that she was working at home on the day of the alleged incident, that she could see into the child's bedroom from her desk, and that the abuse never occurred. Defendant's mother, who was extremely close to defendant's ex-wife, alleged that the ex-wife had told her she was considering fabricating an abuse charge in order to gain full custody of the child. A medical doctor testified that the child's vaginal irritation could have been caused by the recurrence of a

yeast infection for which he had treated the child several times. In addition, there was considerable controversy about the child's description of her body. For example, defendant and his girlfriend testified that the child referred to both her anus and her vagina as her "bummy," while several witnesses for the State asserted that she used the term only when referring to her vagina. On the key issue of the abuser's identity, several witnesses for the State testified that the child referred only to defendant as "Daddy," while those appearing for defendant, mostly relatives, said that the child used the word "Daddy" to refer to both her father and her stepfather. On rebuttal, after the defense had attacked the child's credibility with statements by defendant's relatives that she frequently lied, the State called a baby-sitter and a teacher to testify about the child's truthfulness.

## II.

The State concedes that the psychologist's account of what the victim told him during his examination of her was error under our recent decision in *State v. Gokey*, 154 Vt. 129, 574 A.2d 766 (1990). There we stated:

> While [experts] may state that the complaining witness exhibits symptoms typical of sexually abused children, [they] may not . . . go so far as to conclude that the witness *is* a victim of sexual abuse. . . . [Expert] testimony, beyond a limited description of the profile and the opinion that the child's behaviors [are] consistent with that profile, [is] inadmissible under V.R.E. 702.

*Id.* at 134, 140, 574 A.2d at 768, 772. The expert's testimony went well beyond these limits. Nonetheless, the State argues that admission of this testimony was harmless, maintaining that, when the "error is merely of an evidentiary rule," the standard of review requires the defendant to demonstrate "prejudice sufficient to overcome the jury's verdict." *State v. Jarvis*, 145 Vt. 8, 14, 482 A.2d 65, 69 (1984). We need not decide the standard-of-review issue, however, because even under the more relaxed standard we are not persuaded the error was harmless.

Demonstrating harmless error in this case even under the lesser standard is a formidable task. The trial judge, who was in

a far better position to weigh the prejudicial impact of the evidence than we are, stated that, had he been on the jury, he would have voted for acquittal. We do not need to rely on the trial court's assessment, however, to conclude that the expert's inadmissible testimony prejudiced defendant sufficiently to require another trial.

### A.

Mental health professionals are currently engaged in debate about the limits of their expertise in child abuse cases. Myers, Bays, Becker, Berliner, Corwin & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation*, 68 Neb. L. Rev. 1, 4 n.4 (1989). The profession has expressed significant doubts about its capacity to make reliable credibility determinations:

> Behavioral scientists have . . . recognized that determining the credibility of a child sexual abuse complainant is not a task for which they are particularly well equipped . . . [and] that they have no particular expertise in evaluating the credibility of a child sexual abuse complainant.

McCord, *Expert Psychological Testimony About Child Complainants in Sexual Abuse Prosecutions*, 77 J. Crim. L. & Criminology 1, 44 (1986). A recent national research project, led by the Association of Family and Conciliation Courts and the ABA Center for Children and the Law, concluded "that in many cases, no amount of expertise will determine if sexual abuse has occurred. . . . There is no litmus test for child sexual abuse." Myers, *Allegations of Child Sexual Abuse in Custody and Visitation Litigation*, 28 J. Fam. L. 1, 31 (1989–90).

Our principal concern is that the psychological expert not be perceived by the jury as a "truth detector"—someone who, by application of scientific method, determines whether the victim is telling the truth about whether the abuse occurred and the abuser's identity. That concern stems not only from questions voiced by the profession about experts' capacity to perform that task but also from our own policy that experts not intrude "on the core function of the jury, infringing upon defendant's constitutional right to trial by jury." *State v. Ross*, 152 Vt. 462, 475, 568 A.2d 335, 343 (1989) (Morse, J., dissenting). Credibility of witnesses is the sole province of the factfinder

and not a proper subject for expert testimony where the prosecution uses it to bolster its case. *Id.* But see *Woodmansee v. Stoneman*, 133 Vt. 449, 458, 344 A.2d 26, 31 (1975) (where outcome of the trial depends on the testimony of the prosecution's sole eyewitness, whose credibility is the critical issue, the court may permit the admission of expert psychiatric testimony that the witness had the personality of a liar, not testimony that she lied in this specific case).

In this case, the psychologist related the child's account of the abuse, including the name of the abuser. Although the psychologist did not explicitly voice his opinion that the victim was truthful, his testimony, when viewed in context, gave the distinct impression that he believed her. He spoke as the first witness, before the jury had even seen the child or heard her story, and he previewed her testimony for the jury almost word for word. He implicitly vouched for the believability of her story by his appearance as a witness for the prosecution.

■ Experts are employed in investigations of child sexual abuse because of the difficulty in discerning the truth when the victim is very young. To qualify as an expert one must have received special training or education. V.R.E. 702. As in this case, those qualifications and the extent of the expert's experience are usually recited in court. Hence, the jury is made aware of the expert's training, and undoubtedly some jurors know that mental health experts are often asked to give credibility assessments. See Smith, *Mental Health Expert Witnesses*, 7 Behavioral Sci. & Law 145, 146 (1989) (over the past decade there has been a significant increase in the type and number of cases in which mental health testimony has been presented; clinicians now participate in about a million cases each year with "significant impact on judges and juries"). It would be naive to believe that a juror would not naturally rely on an expert trained in the diagnosis of sexual abuse to resolve, at least in part, the issue of the victim's credibility, often the most crucial aspect of the prosecution's case.

■ We permit mental health experts to help jurors understand "the emotional antecedents of the victim's conduct" so that they "may be better able to assess the credibility of the complaining witness." *State v. Catsam*, 148 Vt. 366, 369, 534

A.2d 184, 187 (1987). There is a danger, however, when this "help" in understanding the symptomology of abused children in general is offered by an expert who has examined the particular child victim. If the jury knows the psychologist has examined the victim, his or her comments are taken in a different light.

We have previously expressed our concern that an expert may lend an improper "'aura of special reliability and trustworthiness'" to a complainant's testimony. *State v. Bubar*, 146 Vt. 398, 401, 505 A.2d 1197, 1199 (1985) (quoting *State v. Saldana*, 324 N.W.2d 227, 230 (Minn. 1982)). In cases like this one, the effect of that aura can be subtle to detect because it results, not only from the psychologist's expertise, but also from his special relationship with the victim.

Corroborating witnesses or physical evidence are extremely rare in cases of child abuse. Sgroi, Porter & Blick, "Validation of Child Sexual Abuse," in *Handbook of Clinical Intervention in Child Sexual Abuse* 39, 69 (S. Sgroi ed. 1982). Although there are behavioral indicators associated with child abuse, they are rarely conclusive. *Id.* at 78. Rather, claims of sexual abuse are "validated" by a credibility assessment that follows an investigative interview often conducted by the mental health professional. *Id.* For the mental health professional, "[d]etermining the validity of an allegation of child sexual abuse is first and foremost a matter of belief. You either believe the child's story or you do not." *Id.* at 69.

The mental health expert relies on interviewing techniques to determine if abuse has occurred. Because children are relatively unskilled verbally, unable or reluctant to express themselves adequately in words, and find alternative ways of communicating less traumatic, interviewers will often rely on observations of the child's activities as the basis of the interview. K. Faller, *Child Sexual Abuse* 158 (1988). The child's age and development will determine which techniques are the most effective: doll play is used with the youngest children (ages 2 through 6 or 7), picture drawing starting at about age 5, and storytelling for school-age children. *Id.* From doll play, drawings, or stories, the interviewer may discover what the child is concerned about. For example, "normal" children may have their dolls fix breakfast or watch TV, while abused children may

repeatedly dress and undress their dolls and have them act out sexual activity. *Id.* Anatomically explicit dolls are used with children of all ages to determine their reactions to sexuality. Children who have not been abused will often be curious about the dolls or make fun of them; abused children often will exhibit emotional reactions and may act out their sexual experiences using them. *Id.* at 169–70. These aids, which encourage children to talk indirectly about their experiences—not objective tests or other standardized indicators—are the initial basis for the expert's opinion.

Moreover, the mental health professional's interview with the victim has therapeutic as well as investigative goals. Sgroi, *supra*, at 48. Emphasis is placed on establishing a relationship with the victim, encouraging the victim to trust the mental health professional. Faller, *supra*, at 156–57. Throughout the interviewing process, the mental health professional is not simply an investigator, but a sympathetic member of a helping profession and a healer. As a result of the complex and special relationship that the expert has with the victim before the case comes to trial, what the jury ends up seeing is not a "hired gun"—the prototypical expert paid one day by a plaintiff, next day by a defendant, to take different sides on controversial issues, and who may be impeached by this very quality. Rather, the jury sees a concerned therapist who has examined the child, believed her, and is probably currently engaged in her recovery process. As a result, the jury may reach the unspoken but unmistakable conclusion that the expert's recounting of the assault is the way it happened, a version often more persuasive than even that presented by the child herself.

Consequently, a juror, hearing a mental health expert testify that in the course of examining the child she told a story of abuse and named her abuser, will naturally conclude that the expert placed faith in the account. Certainly, a reasonable juror would be hard pressed to conclude otherwise. If the diagnosing expert's examination shed any doubt on the child's credibility, it would be unnatural and uncharacteristic for the expert to testify for the prosecution.

## B.

Noting that we weigh the limited nature of testimony in assessing its degree of prejudice, the State argues that the expert's hearsay statements were merely cursory. However, an expert's account cannot be characterized as limited when it helps the prosecution persuade the jury that the testimony of the four-year-old victim was credible. The State makes much of the fact that, although the jury asked for a significant amount of testimony to be read back, it did not ask for the expert's testimony. However, the jury may not have asked for the psychologist's testimony because they found it unequivocal and easily understood, not because they disbelieved it or found it unimportant.

## C.

The State also contends that the expert's testimony was merely cumulative and the victim was available for cross-examination. See *State v. Dunbar*, 152 Vt. 399, 412–13, 566 A.2d 970, 977–78 (1989) (lay witness's testimony that five-year-old victim told her that "the fat man"—the defendant weighed 400 pounds—had sexually assaulted her, did not require reversal); see also *State v. Derouchie*, 153 Vt. 29, 33, 568 A.2d 416, 418 (1989) (admission of doctor's hearsay account of the sexual assault was harmless error because he did not identify defendant as the assailant, his testimony was cumulative, and the victim, who was not a child, was available for cross-examination); *State v. Gallagher*, 150 Vt. 341, 349, 554 A.2d 221, 226 (1988) (admission of doctor's hearsay testimony that victim had told him defendant assaulted her was harmless error because doctor's testimony was merely cumulative and nine-year-old victim was available for cross-examination).

We can readily distinguish a child's account of abuse to a layperson from that given in a clinical context because the average juror believes that psychologists are specially trained to ferret out truth. In short, a layperson's account does not "cloak[] the child's testimony with a favorable expert opinion, imbued with scientific respectability and reliability." *Gokey*, 154 Vt. at 140, 574 A.2d at 771. Even the testimony of medical doctors carries no special weight. Doctors are focused primarily on

treatment of physical trauma. Although victims may identify alleged perpetrators in the course of a medical examination, such information is not relevant to the doctor's work. Doctors do not evaluate the truth of their patients' statements and have no particular expertise in that area. A juror hearing a medical doctor repeat a victim's statement would not readily assume the doctor also evaluated the truth of its contents as a forensic witness. On the other hand, as we have discussed, any juror with common intelligence and sensibilities could hardly escape the message that a psychologist testifying as a forensic expert had listened to the victim's story and found it credible. Here, the psychologist's testimony was not merely cumulative; it was the foundation on which the State built its case.

### D.

Finally, the State argues that the prosecution did not emphasize the psychologist's testimony in final argument and did not mention the hearsay. The prosecution said in closing:

> Let's talk about Dr. Rightmyer for a minute. He's a clinical psychologist. He told you he sees children or has seen children that are victims of sexual abuse. And that experts who see children sometimes see common symptoms in children. And he described those symptoms for you: anxiety, fearfulness, aggression; that sometimes there's physical signs such as infections, urinary infections. And another interesting thing he told you was that it's not uncommon for children to delay somewhat in reporting when someone sexually abused them. And they do that because they don't know. They feel maybe they'll be held responsible, that someone will be angry with them.
>
> Do those symptoms sound familiar, Ladies and Gentlemen? *Or maybe a three-year-old child is sophisticated enough to lie about those things too.* (Emphasis added.)

Contrary to its assertions, the State directly referred to the expert's testimony and intimated that the psychologist found the child's story believable. The child, in other words, *may* have been "sophisticated enough" to fool the expert, but being merely "a three-year-old child," it was not likely.

In short, when credibility is in issue, the risk that jurors will abdicate their responsibility to assess the victim's credibility by inferring that an examining psychologist believed the patient is too apparent to pass off as minimal.

We need not reach defendant's other issues because they are unlikely to occur on retrial.

*Reversed and remanded.*

**Peck, J.,** dissents without opinion.