**State of Vermont v. Richard Weeks**

[628 A.2d 1262]

No. 91-284

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed June 18, 1993

*Jeffrey L. Amestoy,* Attorney General, and *Susan R. Harritt,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*E.M. Allen,* Defender General, and *Anna Saxman* and *Henry Hinton,* Appellate Attorneys, Montpelier, for Defendant-Appellant.

**Morse, J.** The principal issue in this appeal from a conviction for sexual assault is whether allowing an expert witness to comment on the child victim's credibility and to identify the perpetrator was plain error. We hold that it was and reverse and remand for a new trial.

## I.

After a bitter divorce, defendant and his ex-wife continued to struggle over his visitation with their daughter and only child. When the child resisted the visits and defendant insisted on them, the mother, on advice of counsel, sought out a psychologist, Dr. Cunningham, to determine whether the child had been sexually abused. Dr. Cunningham examined the child three times over a six-day period. Between the second and third visits, he reported to the Department of Social and Rehabilitation Services (SRS) that the child had been sexually abused. An

SRS worker and a police officer interviewed the child, and defendant was subsequently charged with three counts of sexual assault under 13 V.S.A. § 3252(a)(3) for incidents of penile-vaginal contact, penile-anal contact, and digital-vaginal contact.

The child victim was six years old at the time of trial; she testified about events that had occurred when she was somewhere between two-and-a-half and four years old. With her mother sitting beside her, she was led through her testimony.

> State: Did you like visiting with your daddy?
> Child: No.
> State: Could you tell us why you didn't like it?
> Child: Because he hurt me.
> State: And how did he hurt you?
> Child: I don't want to tell.
> State: This is the last time you have to tell, [J.W.]. Can you tell them how he hurt you? Did he hurt you on your body?
> Child: (Nods head.)
> State: Can you tell us where?
> . . . .
> Child: Private place.

She then identified the private place (her vagina) and "what he used to touch [her] with" (his penis) by making marks on anatomically correct drawings. The court allowed these drawings "to assist in the development of the testimony. She's, obviously, very reluctant to testify again today." On cross-examination, J.W. admitted that she had previously told defense counsel that her daddy did not touch her and that this was a lie.

> Defense: Do you remember telling me before . . . that your daddy didn't touch you?
> Child: Uh huh.
> . . . .
> Defense: Okay. Was that a lie, back then, when you said that daddy did not touch you?
> Child: Uh huh.
> Defense: So you told a lie one time about all this?
> Child: Uh huh.

The child's credibility was the central issue at trial. Defendant claimed that he had been falsely accused, that his ex-wife

had fabricated the story to keep his daughter away from him. He sought to show inconsistencies in the child's story and to emphasize that she had recanted to both Dr. Cunningham and defense counsel.

The State supplemented her testimony with five additional witnesses: the child's mother and maternal grandmother, the SRS worker and the police officer who had interviewed her, and Dr. Cunningham. The child's mother testified that the child became increasingly unwilling to visit with her father, that she would get sick the night before the visits and would refuse to get dressed the next morning. The child's symptoms got worse —she had nightmares, would throw up her breakfast, refuse to get out of the car—but she would not explain why she did not want to go with her father. When the child returned from visits she did not want to take a bath and would say she did not want to be touched. When she was put in the bathtub, she would spread her legs apart and push toys into her vagina. The mother testified that she never considered the possibility that her daughter had been sexually abused. Rather, when she consulted her lawyer about whether the visits had to continue, he suggested that she take the child to a doctor to find out why she resisted the visits. The mother testified that, after telling Dr. Cunningham about the abuse, the child also told her some details about it and that her father said if she told her mother about the abuse, her mother would hate her and he would go to jail. The grandmother corroborated the child's resistance to visits with her father and her increasingly sexualized behavior during baths.

An SRS worker, Kelly Smith, testified that she notified the state police after receiving a report of sexual abuse from Dr. Cunningham and, accompanied by Sergeant Robert Vargo, interviewed the child victim. Ms. Smith stated that, after establishing rapport with the child and asking her to identify body parts, she asked the child if anyone had touched her vagina. The child responded that her daddy had. Ms. Smith related that the child, using anatomically correct drawings, showed that defendant had touched her vagina with his penis, nose, and hand. She also indicated that the child told her that she was afraid she was going to get in trouble for talking with her. Sergeant Vargo, who was present during part of the interview, corroborated Ms. Smith's account.

Dr. Cunningham was the State's final witness. He began by describing symptoms typical of sexually abused children. Anticipating an attack on the child witness's credibility, he stated that delayed reporting is not unusual, especially if the abuse occurs within the family, and that recanting is common, a "kind of a wish that . . . it never happened." He explained that multiple interviewing can lead children to recant because when asked the same question a number of times, they get the message that they will not be believed and, in essence, they give up. He also stated that often the nonabusive parent will become upset at disclosure of the abuse and the child will change the story to protect that parent from further pain.

He then described his interviewing technique in great detail, particularly the use of anatomically correct pictures. First, he showed the child drawings of naked children and asked her to find one who looked like her. He then asked her to name the body parts and to mark places where she had been touched that she did not like. He then asked who had touched her and to find a drawing of a (naked) person who looked like the abuser. He then asked her to identify the part of the abuser's body that had touched her.

The testimony then moved to the key area of identifying the perpetrator. Dr. Cunningham stated that he had asked the child who had touched her and testified

Expert:  Her first answer was, daddy.
State:  Did you ask her any more questions, regarding who daddy was?
Expert:  Yes. I was aware it was a divorce and that there was another man, Mitch, living with her and her mother. And so I asked her, is this daddy, Mitch, or daddy, Richard. . . .
State:  And what did she say?
Expert:  She said daddy Ricky.

Dr. Cunningham returned to the issue of the perpetrator's identity and stated his personal opinion that the perpetrator was not Mitch:

State:  And did you specifically ask about Mitch?
Expert:  Yes; I did.
State:  Was she clear about that as well?

> Expert: She was very clear about that. . . . I was pressing that quite hard . . . because . . . there was greater access of Mitch to her than her father at the time, and I wanted to get to that issue directly.
>
> State: But you pretty well resolved that in your mind, that [it] wasn't Mitch.
>
> Expert: Yes, ma'am.

Because Mitch was the only other possibility raised, this remark was tantamount to Dr. Cunningham's naming the child's abuser.

Dr. Cunningham's testimony on the child's credibility cannot be easily summarized. It did not take the form of one or two isolated statements; rather, it followed the path of his own reliance on the child's word—how he came to believe her to the point that he reported abuse to SRS.

Dr. Cunningham first described his process for verifying a child victim's account of abuse. Basically, he would ask for descriptions in various different ways (pictures, dolls, questioning) and repeat this process over more than one interview, looking primarily at the level of detail and the degree of consistency. He stated that consistency is particularly important to determining whether an allegation is fabricated:

> State: . . . do you try to determine whether or not the child has been coached or these responses suggested to her by someone else?
>
> Expert: Yes; I do. What I look for is a consistency between the different meetings that I have.

After relating the details of the child's first visit, Dr. Cunningham then testified that she had described the same kinds of abuse and identified the same abuser on the second visit. After the second visit, Dr. Cunningham called SRS to report abuse because "I thought I had sufficient reason to believe that [she] had been sexually abused and that consistency to identify her father as the perpetrator." In response to State questioning, he conceded that he was "mandated by law, if I even suspect sexual abuse, to report it to either the police or SRS."

Dr. Cunningham testified about the child's credibility in other ways. He testified that he knew fabrication was more likely where divorced parents were engaged in visitation disputes and

that he therefore questioned the child directly about whether her mother had prompted her.

And she was real clear with me, that no, her mother did not. It did happen. That if somebody said that her mother had told her to say this to me about dad touching, that that was a lie. And again, this is a girl who I'd be hard pressed in high school to debate with this child. *I found her to be rather definitive.*

(Emphasis added.) In response to the State asking whether, based on his expertise, the child's disclosures could be "solely attributable to a divorce that may have had some dispute over custody or visitation," Dr. Cunningham stated, "I would not make that conclusion."

In talking about how children commonly characterize sexual contact, he concluded that the child's way of describing anal/penile contact by pointing to the appropriate anatomical drawings and saying, "he got me with this" was "indicative of a genuine statement from her," in other words, her way of describing the incident made him believe that it had actually occurred.

## II.

Defendant argues that it was plain error for Dr. Cunningham to identify him as the perpetrator and to imply that the child's allegations were true. The State responds that the majority of Dr. Cunningham's testimony was admissible under V.R.E. 804a and as expert testimony on the profile characteristics of abuse victims.

Under V.R.E. 804a, a witness may testify to hearsay statements made by a child ten years old or younger if the statements are offered in a sexual assault case where the child is an alleged victim, the statements were not taken in preparation for a legal proceeding, the child is available to testify, and the circumstances surrounding the statements show substantial indicia of trustworthiness. The trial court scrupulously followed V.R.E. 804a, qualifying Dr. Cunningham's testimony in preliminary hearings and making extensive findings, and the applicability of the rule is not questioned on appeal. The inquiry, however, does not end there.

Rule 804a has not overruled our long line of precedents on the parameters of expert testimony, starting with *State v. Cat-*

*sam,* 148 Vt. 366, 371, 534 A.2d 184, 188 (1987). Categorizing an expert's testimony as admissible hearsay under V.R.E. 804a does not absolve us of responsibility for analyzing its content. In this case, the expert's role went far beyond merely relating the victim's account of the abuse. Rather, the expert acted as the ultimate "truth detector," both implicitly and, on occasion, explicitly vouching for the victim's story, a role condemned in our recent decision in *State v. Wetherbee,* 156 Vt. 425, 431, 594 A.2d 390, 393 (1991), because it undercuts the jury's function as factfinder on the victim's credibility. Unlike *Wetherbee,* however, the analysis here is one of plain error because defendant only objected to the expert's testimony on Rule 804a grounds.

■ Plain error analysis is fact-based, turning largely on the specifics of each case. *State v. McCarthy,* 156 Vt. 148, 154, 589 A.2d 869, 873 (1991) (applying plain-error rule necessarily involves appellate discretion and weighing of all relevant factors). Obviousness of the error and prejudice to defendant are the key factors in the analysis. *State v. Ross,* 152 Vt. 462, 469, 568 A.2d 335, 339–40 (1989).

■ In order to be "obvious," an error must be one that the trial court should easily recognize. Plain-error analysis is not static because recognition of errors is helped by instruction. The admission of an expert's testimony on the victim's credibility and the identity of the perpetrator have been condemned in case after case. See, e.g., *State v. Gokey,* 154 Vt. 129, 140, 574 A.2d 766, 771 (1990) (expert's testimony repeating to jury child's description of assault and confirming child's capacity to tell truth "impermissibly cloaked the child's testimony with a favorable expert opinion, imbued with scientific respectability and reliability"); *Catsam,* 148 Vt. at 371, 534 A.2d at 188) (expert testimony on truthfulness of child victims of sexual abuse may unduly influence jury and therefore is inadmissible). These cases, as well as *Wetherbee,* 156 Vt. at 431–34, 594 A.2d at 393–95, in which the dangers of using the psychological expert as "truth detector" are exhaustively discussed, were decided before the trial in this case, and the court should have known about them.

In addition, defendant was greatly prejudiced by the expert's impermissible testimony. It would be difficult to overstate the

psychologist's influence in this case. He was the first person to whom the child victim disclosed the abuse, the person who reported the abuse to SRS, and far and away the State's most important witness. He testified abuse had occurred, gave details about the abuse that the child could not relate, and explained away discrepancies in her various accounts and her recantation. His description literally made sense of the child's testimony because her way of relating the events in court replicated the system that he had used for diagnosis and which the police officer and SRS worker had used for investigating the allegation.

In contrast to the sparseness of the child's testimony, his testimony was articulate and expansive. Covering 77 transcript pages, more than a third of all the testimony in a trial with eight witnesses, his testimony is a richly detailed roadmap of how he elicited and came to believe the child's allegations of abuse. From the outset, the jury knew, not only that he had personally examined the victim, but that he had tested her perceptions and credibility, and, that based on his conclusions, he reported the abuse and defendant as the perpetrator to SRS. He not only vouched for the victim's credibility but staked his professional reputation on it. When Dr. Cunningham was finished testifying, no one could reasonably doubt that he had given his unqualified endorsement of the child's believability.

The State relied heavily both on Dr. Cunningham's testimony and, very explicitly, on the "'aura of special reliability and trustworthiness'" that his belief in the victim gave to her story. *State v. Bubar*, 146 Vt. 398, 401, 505 A.2d 1197, 1199 (1985) (quoting *State v. Saldana*, 324 N.W.2d 227, 230 (Minn. 1982)). In closing arguments, the State first argued that the abuse report was more credible because it originated outside the family:

> It's a psychologist; it's a police officer; it's a social worker. They are the people here who have no interest, whatsoever, in the outcome of this case. They are complete strangers to the Weeks family . . . . They have no motive; they have no interest. They have nothing to gain or lose . . . .

In rebuttal, the State again stressed Dr. Cunningham's status as an objective expert and his capacity to detect fabrication:

> Doctor Cunningham testified to you that there's no way to explain away everything that was happening here as a

problem with the divorce and a problem with custody. Absolutely, no way, he said. Doctor Cunningham is an expert in this field. Now, maybe [defense counsel] doesn't like that and maybe [defense counsel] is a little frustrated about the fact that Doctor Cunningham knows what he's talking about and has had a lot of experience in this case, but that fact remains. This Court has recognized him as an expert and he has been so recognized about 40 other times as well. So he knows what he's talking about.

. . . .

[Defendant] picks apart Doctor Cunningham, as if Doctor Cunningham isn't sharp enough to pick up on whether or not a child is lying to him. . . . There are a number of times he's come to the conclusion that a child is fabricating . . . .

. . . .

And they disparaged Doctor Cunningham's even getting paid here. He's working for the mother. He's got a reputation to uphold, too. He's not going to risk that simply because he's asked to visit with a child and see what any problems might be. I mean, let's deal with reality here. If he didn't find anything, he would have told you that, because he's done it before. He's found other kids, that they have fabricated. They have been pushed and taught by their parent. He didn't find that in this case.

By making such extensive use of the expert's reputation and his judgment about fabrications, the State encouraged the practice of trial by expert that our cases condemn. See *Wetherbee*, 156 Vt. at 431, 594 A.2d at 393 ("psychological expert [must] not be perceived by the jury as a 'truth detector'—someone who, by application of scientific method, determines whether the victim is telling the truth about whether the abuse occurred and the abuser's identity"). Where, as in this case, the expert infringes on the jury's core function by telling it what and who should be believed, the error is particularly acute.

Additional evidence of prejudice can be inferred from the fact that the jury found defendant guilty only of those charges that the expert verified. The child victim testified about only one instance of abuse, vaginal-penile contact. The SRS worker and police officer testified about that incident and an additional one

of digital-vaginal contact, a charge on which defendant was found not guilty and about which Dr. Cunningham did not testify. The expert was the *sole* witness on an incident of anal-penile contact, for which defendant was convicted. The expert's testimony was considered critical by the jury on two of the three charged incidents.

The errors here were multiple and egregious. The expert made the original diagnosis, prompting the original charge. He explained why the victim had not reported the abuse, why she had recanted, and why the details in her story made her persuasive. He told her story multiple times and concluded that consistency in the telling made her persuasive. He vouched for her credibility and confirmed her identification of the abuser. This case dramatically extends the expert's role, letting him basically investigate, prosecute, and judge the case. The case must be remanded for a new trial.

### III.

### A.

Prior to trial, the defense sought to conduct its own psychological evaluation of the child victim, a request denied by the court. In addition, defendant unsuccessfully sought to disqualify the child as a witness on grounds of incompetency and to depose her for a third time after she had recanted to defense counsel and then refused to answer any further questions in earlier depositions. On these latter two issues — competency and the efficacy of a third deposition — the court took testimony only from the State's expert, Dr. Cunningham. At trial, defendant sought to put Dr. Cunningham's role in issue, arguing that his leading questions and "suggestions" to the child during the initial interviews had persuaded her that "things have happened" to her.

Defendant argues that under these circumstances, the court's denial of his request for an independent psychological evaluation of the child violated his right to due process. See *State v. Percy*, 149 Vt. 623, 636–38, 548 A.2d 408, 416–17 (1988) (discussing due process right to reciprocal discovery as developed in *Wardius v. Oregon*, 412 U.S. 470 (1973)). Had we upheld the expert's role in this case, we might be inclined to agree. See

*State v. Ross,* 152 Vt. at 466, 568 A.2d at 338 (in appropriate cases, defendant may have own expert examine victim). On retrial, however, Dr. Cunningham's role may be more limited, and the issue may develop differently. We, therefore, decline to address it now.

### B.

Sergeant Vargo, Ms. Smith, and Dr. Cunningham all offered hearsay testimony describing the victim's account of an incident in which defendant attempted to have her drink a fluid she described as milk and "peepee." In addition, they related incidents where defendant touched the child's bottom with his nose, "peed on her," and attempted oral sex with her. Defendant contends that all evidence of uncharged bad acts should not have been admitted because the State did not provide notice as required by V.R.Cr.P. 26(c) and because evidence concerning such acts was inadmissible under V.R.E. 404(b). He further contends that the State's closing argument improperly referred to these uncharged acts and that the court's instruction erroneously permitted the jury to consider them. All of these objections, raised for the first time on appeal, will not be addressed. Defendant will have an opportunity to raise them, and the court to respond to them, on retrial.

*Reversed and remanded.*

**Gibson, J.,** dissenting. I am unable to agree with the majority opinion. It ignores our plain-error precedents, and despite the majority's rhetoric, the record presents no obvious error that affects defendant's substantial rights. The opinion is also troubling because it not only departs from precedent but it provides no new guidelines for the trial courts in future cases. I therefore dissent.

The majority takes exception to the expert testimony presented in this case. The expert played two important roles herein. First, he provided a detailed account of the child's communications about the abuse as the first person to whom the child disclosed that she had been sexually abused. He explained his interviewing technique and then repeated the child's disclosures to the jury. He also provided details about the abuse that the child was unable to verbalize but that she had been able

to demonstrate with dolls. This testimony corroborated the child's allegations, thus fulfilling a major purpose of V.R.E. 804a. See Reporter's Notes, V.R.E. 804a (legislative intent to cure frequent problem of lack of corroboration caused by traditional hearsay rules).

The expert's second role was to rebut defendant's attack on the child's credibility. At trial, the child was cross-examined by defense counsel about having recanted her allegations during a deposition. The expert, as the State's last witness, testified that delayed reporting of sexual abuse and recantation are not unusual phenomena. Such testimony is admissible and is useful to assist the jury in assessing the complainant's credibility. *State v. Gokey*, 154 Vt. 129, 133–36, 574 A.2d 766, 768 (1990). The expert also explained that consistent and detailed allegations of abuse are not likely to have been fabricated. His testimony provided specialized knowledge designed to help the jury assess the evidence — a proper purpose of expert testimony. V.R.E. 702; see *State v. Catsam*, 148 Vt. 366, 371, 534 A.2d 184, 188 (1987) (expert testimony on truthfulness of child sexual abuse victim not admissible unless it will assist jury to understand the evidence).

Defendant argues that the expert testimony exceeded the permissible limits of these two roles, but he did not raise this objection at trial. Review is therefore limited to plain error. *State v. Sims*, 158 Vt. 173, 181, 608 A.2d 1149, 1154 (1991). Under the plain-error standard, reversal is warranted only if the error is obvious and affects substantial rights of the defendant. *Id.* As the majority notes, an error is obvious if it is one that the trial court should easily recognize. 160 Vt. at 400, 628 A.2d at 1266. The majority finds that two errors were obvious: (1) the expert's testimony on the victim's credibility, and (2) the expert's testimony on the identity of the perpetrator. I find neither "error" so obvious that the trial court should have recognized it sua sponte, or so egregious that we should reverse.

The expert testimony on the child's credibility does not warrant reversal because there was no obvious error. The majority admits that this testimony "cannot be easily summarized," explaining that "[i]t did not take the form of one or two isolated statements; rather, it followed the path of [the expert's] own

reliance on the child's word — how he came to believe her to the point that he reported abuse to SRS." *Id.* at 398, 628 A.2d at 1264–65. At what point the testimony became obvious error is not stated in the majority opinion. Of course, "[h]indsight always offers a more complete assessment of error and its impact," *State v. McCarthy*, 156 Vt. 148, 159, 589 A.2d 869, 876 (1991) (Morse, J., dissenting), but the test on appeal is whether the trial court should easily have recognized the error at the time. I do not see how the trial court could have easily recognized the "path" of the expert here. The error, if any, was not obvious. Further, had the testimony been so obviously out of line as the majority would have us believe, it would have prompted an objection or a motion to strike by defendant's experienced defense counsel. Neither action was taken. "Yet, this Court today holds in hindsight that the trial court sua sponte should have stopped the State in its tracks." *Id.* at 159, 589 A.2d at 875–76 (Morse, J., dissenting).

Expert testimony implying that a child complainant is credible is not error per se. Clearly, the State calls an expert to testify in support of its case. See *State v. Wetherbee*, 156 Vt. 425, 434, 594 A.2d 390, 395 (1991) ("If the diagnosing expert's examination shed any doubt on the child's credibility, it would be unnatural and uncharacteristic for the expert to testify for the prosecution."). To this extent, the testimony of the expert ordinarily implies that the complainant is telling the truth. It is improper, of course, for an expert to testify directly to the truthfulness of the complainant. *Catsam*, 148 Vt. at 371, 534 A.2d at 188. Even testimony that is "tantamount to a direct comment that the complainant was telling the truth about the alleged sexual assault" is impermissible. *Id.* at 370, 534 A.2d at 187. Here, there was no such direct testimony, however.

The majority describes the expert's testimony as "articulate and expansive" in contrast to the "sparseness" of the child's testimony. 160 Vt. at 401, 628 A.2d at 1266. The difference should not be unexpected. The child was six years old and testifying to a matter that was sensitive and embarrassing in a courtroom setting that was unfamiliar. In his testimony, the expert properly described the procedures he followed in examining the child. Nowhere does he "vouch[] for the victim's credibility" or "stake[] his professional reputation on it." *Id.* at

401, 628 A.2d at 1266. The majority can point to no testimony that goes this far.

According to the majority, the error should have been obvious to the trial court because we have condemned this type of expert testimony in *Catsam, Gokey,* and *Wetherbee.* In *Catsam,* we held that expert testimony that children suffering from post-traumatic stress disorder do not fabricate stories about sexual abuse was not admissible under V.R.E. 702. 148 Vt. at 370–71, 534 A.2d at 188. Because the expert also testified that the complainant had post-traumatic stress disorder, this statement was "tantamount to a direct comment" that the complainant did not fabricate the sexual abuse charges. *Id.* at 370, 534 A.2d at 187. There is no comparable testimony in the instant case. The expert here testified that detailed and consistent statements given by a child are not likely to have been fabricated. This "specialized knowledge," V.R.E. 702, helped the jury to better understand the child's testimony and evaluate her credibility by examining the consistency of the statements she made to the expert and to the SRS worker. Unlike diagnosing a psychological disorder, the jury is able to evaluate whether statements are consistent without expert opinion.

In *Gokey,* we held that expert testimony repeating the child's statement that the defendant had abused her was improperly admitted under V.R.E. 702, 703 or 705. 154 Vt. at 139–40, 574 A.2d at 771–72. We reached this decision because we concluded that testimony about the child's hearsay statement was not profile evidence, admissible under V.R.E. 702, nor the basis of the expert's opinion that the child exhibited symptoms common to sexually abused children, admissible under V.R.E. 703 or 705. *Id.* at 138–40, 574 A.2d at 770–72. Likewise, in *Wetherbee,* 156 Vt. at 430, 437, 594 A.2d at 392–93, 396, we held that it was impermissible under V.R.E. 702 to allow a psychologist to repeat the victim's statement that the defendant was the abuser, that such testimony went beyond the limits set forth in *Gokey,* and that this error was not harmless.

Neither the rule nor the rationale of *Gokey* is applicable here because the child's hearsay statements were not admitted as profile evidence or as the basis of the expert's opinion. They were admitted as substantive evidence under V.R.E. 804a to corroborate the child's complaint. This Court has never held

that a witness may not testify to a child's hearsay statements identifying the perpetrator under V.R.E. 804a. See, e.g., *State v. Gallagher*, 150 Vt. 341, 349, 554 A.2d 221, 226 (1988) (statements of "cause," such as child's identification of abuser, "are more properly admitted under Rule 804a, which requires specific findings of 'trustworthiness'").

In the instant case, the expert never testified that he believed defendant was the perpetrator; rather, he testified that the child had told him defendant was the perpetrator. The trial court concluded that these statements were admissible under V.R.E. 804a. The court conducted preliminary hearings prior to receiving testimony about the child's statements, and it made extensive findings, as required by V.R.E. 804a. Its findings are supported by the evidence.

Moreover, defendant's substantial rights were not affected by the V.R.E. 804a hearsay statements identifying him as the abuser or the expert's statement indicating that he had resolved in his mind that the abuser was not the child's stepfather. There was no issue regarding identity in this case. The child identified defendant as the perpetrator at trial. Two witnesses testified that all of the child's symptoms emerged before and after visitation with defendant. The child was taken to the expert to find out why she resisted visitation with defendant, and she revealed to the expert that defendant had sexually abused her.

Defendant never suggested that the child may have been abused by another person. Rather, he sought to convince the jury that the child's mother had fabricated the allegations to prevent his visitation with the child. The expert's opinion that the stepfather had not sexually abused the child was therefore consistent with the theory advanced by the defense that no abuse had ever occurred. Indeed, any allegations of abuse by another person would have diminished defendant's argument that the stories were fabricated to prevent his contact with the child. "We do not know defendant's strategy in this case, and his lack of objection may have been an intentional trial tactic." *McCarthy*, 156 Vt. at 159, 589 A.2d at 876 (Morse, J., dissenting).

Our law thus does not require a reversal in this case based on any statement by the expert identifying defendant as the per-

petrator. V.R.E. 804a was designed to provide a mechanism by which out-of-court statements of a child ten years of age or younger could be placed in evidence. By its action today, the majority has effectively eviscerated this rule.

The majority also departs today from a long line of plain-error precedent on the issue of expert testimony in child sexual abuse cases. "This Court has never found an expert's impermissible comment on a child sexual abuse complainant's credibility to be plain error." *Sims,* 158 Vt. at 181–82, 608 A.2d at 1154. In *Sims,* we compared the expert testimony at issue to the expert testimony in other plain-error cases and concluded that there was no plain error.

> When the substance of the testimony in this case is compared with that in the foregoing cases, it is difficult to conclude that plain error was committed here. In [*State v.*] DeJoinville, no plain error was found despite the fact that the expert expressly testified about the credibility of child sexual abuse complainants. 145 Vt. [603,] 604, 496 A.2d [173,] 174 [(1985)]. In [*State v.*] Recor, the expert stated that the consistency of a child's statements "gives me a sense that what they are saying happened, happened." 150 Vt. [40,] 45, 549 A.2d [1382,] 1386 [(1988)]. In [*State v.*] Ross, the expert not only detailed the complainant's sexual activity with the defendant as told to her by the complainant, and not only stated that young children do not fabricate stories of sexual abuse, but also expressly concluded that the complainant had been sexually abused by the defendant. 152 Vt. [462,] 467–68, 568 A.2d [335,] 339 [(1989)].

*Id.* at 182, 608 A.2d at 1154. The expert testimony in the instant case is less egregious than that in *Sims, Ross, Recor,* or *DeJoinville.*

Even if error were obvious here because similar testimony has "been condemned in case after case," 160 Vt. at 400, 628 A.2d at 1266, the error did not affect defendant's substantial rights. In case after case, we have found that similar testimony did not affect the rights of the defendants in those cases. Conducting a *Sims* comparison here can only lead to the conclusion that the expert testimony does not amount to plain error. Cf. 158 Vt. at 182, 608 A.2d at 1154. The majority ignores this

precedent, as it downplays the corroborating testimony of the grandmother, police officer, and social worker, and the graphic description by the mother of the child's increasing symptoms of distress at her impending visits with defendant.

My final difficulty with the majority's decision lies in its impact on future trials. The effect of the combination of discarding our established precedents and failing to set forth guidelines for the introduction of evidence under V.R.E. 804a will inevitably leave the courts in a state of perplexity. The courts can no longer look to our previous cases to determine what is or is not admissible or what may constitute an error so grave that they must act sua sponte. Rather, the majority creates a vague "hindsight" test, frustrating the notion that plain error should be plain in the first instance.

I respectfully dissent. I am authorized to state that Chief Justice Allen joins in this dissent.