2008 VT 69

# State of Vermont v. Douglas Danforth

[956 A.2d 554]

No. 07-017

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 9, 2008

*Jane Woodruff*, Department of State's Attorneys and Sheriffs, Montpelier, and *Vincent Illuzzi*, Essex County State's Attorney, Orleans, for Plaintiff-Appellee.

*Michael Rose*, St. Albans, for Defendant-Appellant.

¶ 1. **Skoglund, J.** Defendant Douglas Danforth appeals from a conviction of assault and robbery, 13 V.S.A. § 608(a) and (c), entered after a two-day jury trial. On appeal, defendant argues that: (1) the evidence linking him to the crime was so speculative that there was insufficient evidence on which to convict; (2) the trial court abused its discretion by disallowing a certain witness's testimony; and (3) the trial court committed plain error by admitting a trooper's testimony vouching for the credibility of two of the State's witnesses. We affirm.

¶ 2. While the parties dispute the identity of the perpetrator, the underlying facts of the crime are uncontroverted. The complainant Terri Williams owns Barney's Market in North Concord, Vermont. In March 2005, after having been informed that her existing security practices had been compromised, the complainant began taking the day's receipts home each evening. Pursuant to this new routine, after closing the store at 9:00 p.m., the complainant would take the day's cash, checks, credit-card slips, and other documents and drive ten minutes to her home, where she kept the receipts in a secure gun safe.

¶ 3. The complainant typically employs thirteen to fifteen people at Barney's. Shanna Ingerson, an employee that the complainant fired in late 2004 for poor workplace performance, nevertheless had remained friends with several of her former coworkers. Two of those coworkers, Elizabeth and Becky Braley, were employed at Barney's when the complainant began taking home the day's receipts. The Braleys, along with most other Barney's employees, knew of the complainant's evening routine. Following her employment at Barney's, Ingerson worked at Dunkin' Donuts in St. Johnsbury, where one of her coworkers was Cheryl Stone, defendant's girlfriend. Elizabeth Braley subsequently also became a Dunkin' Donuts employee.

¶ 4. On the evening of April 25, 2005, the complainant followed her now-routine practice of collecting the day's receipts after

closing and headed home with roughly $7,000 in cash, checks, and credit-card slips. About a quarter of a mile from her home on a remote dead-end dirt road, the complainant encountered a small tree lying across the road. As she got out of the car to move the tree, she heard a noise and saw a man clad in dark pants, a dark sweatshirt, and a mask running at her. She managed to get back into the car but could not close the door in time. The man pinned her to the car seat and pepper-sprayed her face, burning her eyes, nose, mouth, and throat. He then took the money bag off the front passenger seat and fled. The complainant described the man as being approximately 5'10" tall and weighing 160-170 pounds. At trial, the investigating trooper testified that the vegetation in an area just off the shoulder of the road was trampled down in a manner suggesting someone had been standing there for some time.

¶ 5. During the course of the investigation, the trooper secured sworn statements from two witnesses implicating defendant in the crime. The first witness, Seth Drown, averred that he had encountered defendant, an old friend, in early May 2005 at an apartment building in St. Johnsbury. According to Drown, defendant told Drown he had "robbed some lady in North Concord." Defendant then recited to Drown details of the crime that the trooper later testified had not yet been released to the public. Drown further averred that defendant had a roll of cash in his pocket at the time of their meeting in St. Johnsbury. Finally, Drown said that prior to the assault and robbery, Ingerson had been "bragging" at Dunkin' Donuts about the complainant's practice of driving home with the day's receipts.

¶ 6. The trooper also received a sworn statement from Nancy Booth. In her statement, Booth averred that she had known defendant since he was thirteen years old and that he was "like a brother" to her. According to Booth, in June 2005, defendant invited Booth to come party with some friends at a motel room defendant had rented in St. Johnsbury. He told Booth that he was able to pay for the room because he had "done a job and he had some money and it was from a store and . . . the lady's name was Terri." Booth also averred that defendant told her on another occasion that he had "robbed somebody."

¶ 7. The trooper reasoned that Becky Braley continued to work at Barney's and remained friends with Ingerson, who, after being fired from Barney's, went to work at Dunkin' Donuts. There

Ingerson became coworkers with Stone, who was defendant's girlfriend. Based on this Braley-Ingerson-Stone connection, and on Drown's statement, the trooper found probable cause to arrest defendant for assault and robbery, 13 V.S.A. § 608.

¶ 8. On the first day of trial, the State introduced testimony from Booth and Drown corroborating their previous sworn statements. The State also introduced the testimony of defendant's former employer. The former employer testified that defendant typically showed up for work only when he needed money, and that defendant did not show up for work shortly following April 25, 2005, despite being owed a paycheck. The State also called the investigating trooper as a witness. The trooper testified that during processing defendant said that he had just moved back to St. Johnsbury two days earlier after living in New Hampshire for the previous two years, but that defendant was unable to provide the trooper with his New Hampshire address. The trooper also testified that, after executing a search warrant, the police recovered a black knit hat and a black-and-white bandana from defendant's home.

¶ 9. On the second day of trial, defendant attempted to introduce testimony from Paul Kennedy to impeach Drown. Kennedy planned to testify that he overheard Drown say that Drown had fabricated the stories implicating defendant. However, the trial court excluded Kennedy's testimony under Vermont Rule of Evidence 613(b) because defendant did not confront Drown with this impeaching testimony when he was on the stand the previous day. Following trial, the jury returned a guilty verdict. This appeal followed.

I.

¶ 10. Defendant first argues that the evidence establishing that he knew about the complainant's close-out practices was based on mere speculation. Evidence tended to show that defendant could have known of the close-out practices through the Braley-Ingerson-Stone connection. In addition, in Drown's sworn statement he said that he believed defendant learned of the complainant's close-out practices through Ingerson's "bragging." When Drown took the stand at trial as the State's witness, he qualified his sworn statement by saying that he did not actually remember if defendant told him he had heard about the close-out routine from Ingerson, or if Drown had simply heard that from other

126

sources, because Drown, defendant, and Ingerson were all part of the same social circle in St. Johnsbury. After this equivocal testimony, the State offered, and the court admitted, Drown's sworn statement into evidence.

■ ¶ 11. Defendant claims that the jury was not entitled to rely on Drown's sworn statement for its substance because the statement was admissible only to impeach Drown. He essentially argues that this statement is an evidentiary "missing link" necessary for the jury to draw an inference that defendant knew — as the perpetrator obviously did — of the complainant's close-out routine. He further argues that relying on the statement for that purpose is impermissible because Drown's testimony merely constituted impeachment evidence. Defendant correctly cites *State v. Dragon*, 128 Vt. 568, 570, 268 A.2d 913, 914 (1970), to support his assertions that "[a] witness, not a party, may be impeached by giving in evidence statements made by such witness, at a former trial or elsewhere, which are inconsistent with his testimony," and that "[s]uch statements are impeaching statements only, and . . . are not evidence to prove the fact to be as stated." However, defendant does not indicate in his brief — nor does the record reveal — that he objected to the admission of Drown's sworn statement or requested a limiting instruction. "When defense counsel fails to request a limiting instruction or fails to object to the absence of a limiting instruction, a defendant's right to raise this issue on appeal is waived." *State v. Turner*, 2003 VT 73, ¶ 14, 175 Vt. 595, 830 A.2d 122 (mem.). His claim is therefore reviewable, at best, under the plain-error standard. *Id.* ¶ 15 (" '[F]ailure to give a limiting instruction . . . in the absence of a request or objection, will be grounds for reversal only on a finding of plain error.' " (quoting *State v. Holcomb*, 156 Vt. 251, 256, 590 A.2d 894, 897 (1991))). "Plain-error analysis requires us to consider whether these are 'exceptional circumstances where a failure to recognize error would result in a miscarriage of justice, or where there is glaring error so grave and serious that it strikes at the very heart of the defendant's constitutional rights.' " *State v. Yoh*, 2006 VT 49A, ¶ 39, 180 Vt. 317, 910 A.2d 853 (quoting *State v. Oscarson*, 2004 VT 4, ¶ 27, 176 Vt. 176, 845 A.2d 337).

■ ¶ 12. There was no plain error here. The State was not required to prove how defendant knew of the close-out practices; it needed to prove only the elements of the crime. Moreover, even

if it would have been improper for the jury to rely on Drown's sworn statement for its substance, the error was harmless. We "review the evidence presented by the State 'viewing it in the light most favorable to the prosecution and excluding any modifying evidence, and determine whether that evidence sufficiently and fairly supports a finding of guilt beyond a reasonable doubt.' " *State v. Baird*, 2006 VT 86, ¶ 13, 180 Vt. 243, 908 A.2d 475 (quoting *State v. Grega*, 168 Vt. 363, 380, 721 A.2d 445, 457 (1998)). In light of this standard, we conclude that circumstantial evidence supported a guilty verdict in this case. The complainant's close-out routine was familiar to her employees. Defendant's association, by proxy through Stone and Ingerson, with the Braleys could have resulted in his learning about that routine. The complainant's physical description of her attacker matched that of defendant. Defendant admitted to the crime to two different witnesses, both times providing details that were not yet released to the public, like the time of day of the attack, the name of the victim, and the fact that checks and credit-card slips were in the bag. Drown testified he saw a large roll of what appeared to be cash in defendant's pocket shortly after the crime. Upon arrest, defendant told police he had been living in New Hampshire for two years, but could not provide a specific address, and testimony from witnesses suggested that he had been living in the St. Johnsbury area that whole time. Finally, police recovered a black knit cap and bandana from defendant's home when executing a search warrant. Given the weight of this circumstantial evidence, the jury could reasonably find defendant guilty.

## II.

¶ 13. We next address defendant's claim that the trial court abused its discretion by denying admission of extrinsic evidence of a prior inconsistent statement of a witness under V.R.E. 613(b), which states in pertinent part: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require."

¶ 14. As noted, Drown testified on the first day of trial that defendant had told him that he had "robbed some lady in North Concord." Both the State and defendant completed their examinations of Drown on the first day of trial, and he was released

from subpoena. During the second day of trial, defendant sought to present Paul Kennedy as a witness. Kennedy and Drown were briefly incarcerated together for unrelated matters shortly after the assault and robbery occurred. Defendant represented that Kennedy would testify that he heard "Drown talking to somebody else about making up stories so [Drown could] get out of jail." According to defendant, Kennedy was also prepared to testify that he overheard either Drown or another inmate say they had actually committed the crime. The court did not allow Kennedy to take the stand, ruling that defendant neither laid a foundation for the introduction of prior inconsistent statements when he cross-examined Drown, nor was Drown kept available to subsequently rebut or deny the same as required by V.R.E. 613. The court noted that its ruling was in line with *United States v. Surdow*, 121 F. App'x 898 (2d Cir. 2005).

¶ 15. In all material respects, the language of V.R.E. 613(b) is identical to that of its federal cousin.* As Vermont's case law interpreting this rule is limited, we rely on federal precedent for guidance. Cf. *Rule v. Tobin*, 168 Vt. 166, 169, 719 A.2d 869, 871 (1998) ("Because our rule [of civil procedure] is identical to the federal rule, we look to the 'Federal cases interpreting the Federal Rules [as] . . . an authoritative source for the interpretation' of our rule." (quoting Reporter's Notes, V.R.C.P. 1)).

¶ 16. Defendant does not argue that he laid a proper foundation for the impeachment evidence while Drown was on the stand on the first day of trial. Rather, defendant argues that the court erred by not considering whether to recall, on the second day of trial, a then-absent Drown. *Surdow* appears to be the majority rule on the issue of when it is appropriate — under circumstances similar to this case — for a court to deny admission of impeachment evidence for failure to lay a Rule 613(b) foundation. In *Surdow*, the trial court denied admission of foundationless evidence to impeach an absent witness where the defendant failed to " 'inform[] the court and opposing counsel, *at the time the witness testifie[d]*, of the intention to introduce' impeaching extrinsic evidence so that appropriate steps may be taken to 'keep the witness available to be called to explain the statement.' " 121 F. App'x at 900 (quoting 4 Weinstein's Federal Evidence § 613.05[5],

---

* Federal Rule of Evidence 613(b) says "interrogate *the witness* thereon" while V.R.E. 613(b) says "interrogate *him* thereon." (Emphases added.)

at 613-28 (2d ed. 2008) (emphasis added)). The court found that resummoning the dismissed witness would have "delayed a trial in which the parties were otherwise ready to rest." *Id.* Unwilling to impose such a delay, the trial court exercised its discretion to exclude the impeaching witness's testimony, and the Second Circuit Court of Appeals upheld that use of discretion. *Id.* The court went on to say that even if there had been error "of constitutional dimension," it was "harmless beyond a reasonable doubt given the significant evidence of Surdow's guilt." *Id.* at 900-01.

¶ 17. A minority rule emerged in *United States v. Barrett*, 539 F.2d 244 (1st Cir. 1976). In *Barrett*, the court held that a court must at least inquire into the availability of the witness to be impeached in order to properly exercise its discretion to deny admission of extrinsic evidence of prior inconsistent statements on the grounds that defendant failed to lay a foundation for the evidence while the witness was on the stand. *Id.* at 255-56. However, at least six federal circuits explicitly or implicitly reject *Barrett*'s lenient approach, instead requiring a foundation to have been laid while the witness is on the stand. See *United States v. Sutton*, 41 F.3d 1257, 1260 (8th Cir. 1994); *United States v. Bonnett*, 877 F.2d 1450, 1462 (10th Cir. 1989); *United States v. Greer*, 806 F.2d 556, 559 (5th Cir.1986); *United States v. Elliott*, 771 F.2d 1046, 1051 (7th Cir. 1985); *United States v. Cutler*, 676 F.2d 1245, 1249 (9th Cir. 1982). According to defendant, under *Barrett*, the trial court should have inquired as to Drown's availability on the second day of trial before exercising its discretion in not allowing Kennedy to take the stand.

■ ■ ¶ 18. Defendant knew what Kennedy's testimony would be prior to trial, but did not alert the court of his intention to use Kennedy's testimony to impeach Drown, even though he had a full and fair opportunity to cross-examine Drown. He did notify the court the morning of the second day of trial, but Drown had already been released from subpoena. While *Surdow* does not *require* notice at the time the first witness testifies (it says only that a court "may reasonably expect" notice), 121 F. App'x at 900, the trial court has "broad discretion in controlling 'the mode and order of interrogating witnesses and presenting evidence.'" *Id.* at 899 (quoting F.R.E. 611(a)); see also *State v. Brochu*, 2008 VT 21, ¶ 60, 183 Vt. 269, 949 A.2d 1035 (quoting V.R.E. 611(a)). Hence, while the trial court could have allowed Kennedy to testify, under

*Surdow*, it properly exercised its discretion in choosing to exclude Kennedy's testimony.

¶ 19. Moreover, defendant's reliance on *Barrett* is misplaced because, contemporaneous to its decision to exclude Kennedy's testimony, the trial court did, in fact, inquire as to whether Drown was still on the premises. The State replied that he had been released from subpoena the day before, and was therefore not present. The court exercised its discretion to preclude the admission of the proffered evidence based on Drown's unavailability. Defendant appears to seek expansion of *Barrett*'s inquiry requirement beyond its intended meaning when he suggests that the trial court should have considered recalling Drown sua sponte and failed to exercise its discretion in not considering whether to do so. Stretching the holding in *Barrett* this far would absolve defendant of any responsibility to lay a Rule 613(b) foundation. The court adequately exercised its discretion.

¶ 20. Finally, our decision today is consistent with the only case this Court has decided under V.R.E. 613(b), *State v. Lund*, 168 Vt. 102, 718 A.2d 413 (1998). The evidentiary issues in *Lund* are similar to those in this case. In *Lund*, a sexual assault case, the defendant wanted to put a sheriff on the stand to testify that the date of the alleged abuse was several months later than the date testified to by the victim. *Id.* at 106, 718 A.2d at 416. The trial court noted that "defense counsel had failed . . . to confront the [victim] with the prior inconsistent statement during his cross-examination of her" pursuant to V.R.E. 613(b). *Id.* at 107, 718 A.2d at 416. The trial court concluded that "allowing the sheriff to testify at that point in the trial would subvert the fair administration of justice and the truth-seeking function of the trial," *id.*, and we affirmed.

### III.

¶ 21. Defendant's final argument is that the trial court erroneously admitted the trooper's expert opinion as to the credibility of witnesses Booth and Drown. This argument also fails. Defendant did not preserve this issue at trial, so, as noted in Part I, *infra*, we will reverse only if the court committed plain error. *Yoh*, 2006 VT 49A, ¶ 36. There was no plain error here.

¶ 22. Police officers routinely testify regarding their investigation and the procedures they utilized in interviewing. See, e.g., *State v. Wigg*, 2005 VT 91, ¶ 5, 179 Vt. 65, 889 A.2d 233. However,

juries are given the absolute task of weighing the evidence and determining the credibility of each witness. *State v. Norton*, 134 Vt. 100, 103, 353 A.2d 324, 326 (1976) ("The credibility of the witnesses and the weight to be given their testimony is the sole province of the jury."). Therefore, an expert may not "infringe[] on the jury's core function by telling it what and who should be believed." *State v. Weeks*, 160 Vt. 393, 402, 628 A.2d 1262, 1267 (1993). Under these standards, the trooper's testimony was permissible.

¶ 23. The trooper did not vouch for the credibility of Booth and Drown; he was not, as defendant asserts, presented as a "truth detector" who, by his specialized training, could determine the credibility of the witness. Information about the trooper's background and training as a police officer is necessary for the jury to make an informed decision about the credibility of the witness, just as the jury is entitled to form its own opinions about the credibility of Drown and Booth under *Norton*. The trooper's testimony was limited to describing for the jury the methods he uses to help ensure the credibility of witness statements given to him during investigations, namely, making witnesses take an oath similar to that required of witnesses in court; having witnesses sign statements swearing to the truth of the information provided; informing witnesses of the consequences of lying to a police officer; and only releasing limited information about a crime to the media so as to verify the source of details known by suspects or witnesses. The trooper further testified that he had no reason to believe the information provided by Booth during the investigation was inaccurate. He testified that he followed standard police investigation techniques and had no reason to believe that the witnesses had deceived him.

¶ 24. Defendant is misguided in relying on *Weeks*, a case in which we held that a psychologist's vouching for the veracity of the complaining witness invaded the province of the jury. In that case, the psychologist's testimony was so extensive and thorough that "no one could reasonably doubt that he had given his unqualified endorsement of the [complainant's] believability." *Weeks*, 160 Vt. at 401, 628 A.2d at 1266. The trooper was not presented as an expert witness, only as a fact witness, and his testimony was strictly limited to his methods for obtaining witness statements. Unlike the psychologist in *Weeks*, the trooper presented no opinions, either personal or professional, as to whether

the witness statements were, in fact, credible. *Weeks* is simply not applicable to the facts of this case. As the trooper's testimony made reference only to his methods for testing witness credibility during an investigation, and not on the stand in the courtroom, we find no error in allowing the trooper's testimony. Accordingly, we affirm the guilty verdict rendered by the jury.

*Affirmed.*