## State of Vermont v. Steven L. Kinney

[762 A.2d 833]

No. 99-122

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed October 13, 2000

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Lisa B. Shelkrot* of *Langrock Sperry & Wool*, Burlington, for Defendant-Appellant.

**Dooley, J.** Defendant Steven Kinney was convicted by a jury on charges of kidnapping, aggravated sexual assault, and lewd and lascivious behavior. He was sentenced to two concurrent terms of forty-years-to-life imprisonment and one concurrent term of four-to-five-years imprisonment. On appeal he argues that (1) the trial court erred in refusing to instruct the jury on diminished capacity as a result of intoxication, (2) there was insufficient evidence to support the conclusion that defendant had the mental state required for conviction of each crime, and (3) the trial court erred in admitting expert testimony about rape trauma syndrome. Defendant also appeals the length of the sentence imposed, claiming that it violates his constitutional right to due process and that the judge imposed it without statutory authority. We affirm both the jury verdicts and the sentence.

According to the testimony presented at trial, defendant committed the offenses during the night of October 9, 1998. He began drinking with friends around 6:00 p.m., and according to his testimony, consumed at least twelve beers during the course of the evening. He also used, together with some friends, three grams of cocaine and two "bowls" of marijuana. One of his friends testified that defendant appeared intoxicated. Defendant admitted during cross-examination that "[his] faculties would have been fairly clouded given the amount of coke, alcohol and pot [he] had consumed over the course of the evening."

At some time after 1:00 a.m., defendant and three friends drove to the home of Lucas Sweetser, hoping to buy some more cocaine. When they arrived, defendant went into the home and emerged a short time later, carrying the victim over his shoulder. He put her in the back seat of the car, and they drove away. The testimony as to what happened inside the house is conflicting. Defendant claims he found Sweetser and the victim asleep in bed. The victim happened to wake up, and they began to talk. The victim said she might be able to help

him find some drugs to buy. When his friends pressed him to leave, defendant picked up the victim, put her over his shoulder, and carried her to the car. According to defendant, the victim was giggling, and went in the car willingly.

The victim testified that she did not go with defendant willingly. She testified that when defendant woke her, he asked her to come with him, but she refused. Defendant then pulled her out of bed and threw her over his shoulder. She resisted, but defendant carried her out of the house and put her in the backseat of the car. According to the victim, she repeatedly said she did not want to go with them and asked to be let out of the car.

Once they were all back in the car, defendant and his friends gave up on finding more cocaine. Instead, they went back to the house where they had been earlier, and all five people, including the victim, drank more beer and smoked marijuana. Defendant and one of his friends testified that the victim got out of the car and walked into the house ahead of them, of her own volition. The victim testified that defendant pulled her into the house by her arm, and another of defendant's friends testified that defendant dragged her into the house "like a puppy dog." The victim also testified that she drank the beer and smoked the marijuana because she did not want defendant and his friends to think she was scared.

Eventually, the party broke up, and the victim went with defendant to his house, where he lived with his parents, because he offered to drive her home from there. According to defendant's testimony, he planned to ask his parents to drive her home, but when they got there, he decided it was too late to wake his parents. He and the victim got into bed, where "one thing led to another," and they had consensual sex. The victim, on the other hand, testified that when they got to defendant's house, he took her to his room and raped her. Afterwards, she fell asleep. In the morning when she woke up, she asked to be taken home, and he arranged for a friend to give her a ride.

Defendant first argues that the trial court erred in refusing to instruct the jury on diminished capacity as a result of intoxication. The issue was raised first by the trial court at the charge conference, but defense counsel indicated that he did not want such an instruction. He reconsidered and later told the court that he did want the instruction. By this time, the charge had been drafted, and the court said the new request was too late. Defense counsel formally objected to the lack of an intoxication instruction following the delivery of the charge to the jury. He did not argue in the closing argument that

defendant did not have the requisite intent for any of the charges because of his intoxication.

■ Intoxication may affect a person's ability to form the mental state requisite for conviction of certain crimes. "When specific intent is an element of a crime, evidence of either voluntary or involuntary intoxication may be introduced to show that the defendant could not have formed the necessary intent." *State v. Joyce*, 139 Vt. 638, 639-40, 433 A.2d 271, 272 (1981); see also *State v. Barrett*, 128 Vt. 458, 461, 266 A.2d 441, 444 (1970). Where there is evidence of intoxication such as to negate the requisite criminal intent, the court should normally instruct the jury that it may consider the intoxication evidence as bearing on intent. See *State v. Smith*, 136 Vt. 520, 528, 396 A.2d 126, 130 (1978) (instruction on diminished capacity should be given where the evidence supports it and where appropriate); *State v. D'Amico*, 136 Vt. 153, 156, 385 A.2d 1082, 1084-85 (1978) (because there was evidence of intoxication, it was for jury to determine if mental capacity was diminished). Of course, if the evidentiary support is absent, the court need not give the instruction. See *State v. Duford*, 163 Vt. 630, 631, 660 A.2d 736, 737 (1995) (mem.) (no instruction required where evidence insufficient to establish defendant's diminished capacity); see also *State v. Day*, 149 Vt. 165, 167, 540 A.2d 1042, 1043 (1987) (only such instructions should be given as arise from and can be based upon the evidence).

The parties agree that at least some of the charges against defendant have specific intent elements such that intent can be negated by intoxication. We emphasize, however, two points relevant to defendant's claim of error here. First, this was not a case where the jury was told that voluntary intoxication was irrelevant to whether defendant committed the crimes. Cf. *State v. Dennis*, 151 Vt. 223, 224, 559 A.2d 670, 671 (1989). The court gave the jury a full and fair explanation of the intent elements of the crimes, and defendant did not object to those aspects of the charge. Defense counsel was free to argue to the jury that the State failed to prove that defendant had the requisite intent in light of the intoxication evidence.

Second, evidence of alcohol or drug consumption, even in large quantities, will not by itself require the court to charge the jury that it can consider defendant's intoxication as bearing on whether he had the requisite intent to commit the crimes charged. See *Jacobs v. State*, 396 So. 2d 1113, 1115 (Fla. 1981) (evidence of alcohol consumption does not, by itself, mandate the giving of jury instructions); *State v. Brown*, 904 P.2d 985, 994 (Kan. 1995) (mere consumption of intoxi-

cants, without evidence of impairment, is insufficient to require instruction); *State v. Cameron*, 514 A.2d 1302, 1308 (N.J. 1986) (same). Indeed, intoxication is not a defense unless it reaches the point where defendant fails "to achieve the state of mental responsibility" required by the charge. *State v. Pease*, 129 Vt. 70, 76, 271 A.2d 835, 839 (1970); see also *McIntyre v. State*, 717 N.E.2d 114, 124 (Ind. 1999) (where record contains no evidence that defendant claimed the inability to form the requisite mens rea because of intoxication, court may properly refuse instruction); *People v. Glenn*, 599 N.E.2d 1220, 1232 (Ill. App. Ct. 1992) (before court must instruct on intoxication, evidence must support that intoxication was so great defendant lacked the requisite mental state for the crime).

Although the question is relatively close, we conclude that the evidence warranted an intoxication charge, informing the jury that it could consider defendant's intoxication as bearing on his intent to commit the charged crimes. The evidence of alcohol and drug consumption alone was insufficient to require the charge, but the evidence of the amount consumed, together with the assessment of a witness that defendant appeared intoxicated on the night in question, and defendant's statement that his faculties were "fairly clouded," were sufficient to warrant the charge.

■ The State argues, however, that even if the court erred in failing to charge on intoxication, the error was harmless in this case. We agree. An error is not grounds for reversal of a criminal conviction if we can say beyond a reasonable doubt that the result would have been the same in the absence of the error. See *State v. Carter*, 164 Vt. 545, 553-55, 674 A.2d 1258, 1264-65 (1996). An error in the charge to the jury can be harmless. See *State v. Wright*, 154 Vt. 512, 517, 581 A.2d 720, 724 (1989). For example, in *Wright*, we held that an error in the charge on the elements of a lesser-included offense to felony murder was harmless because the evidence in support of any lesser-included offense was "virtually nil." *Id.* at 520, 581 A.2d at 725.

Defendant testified in this case and described in detail the events of the night of the offense in support of his position that the victim voluntarily accompanied him and voluntarily engaged in sexual relations with him. He never suggested in argument or in testimony that he was so impaired that he could not have the requisite criminal intent. His position was that he knew his intent and it was exactly the opposite of that charged by the State.

Although there was extensive evidence of defendant's alcohol and drug consumption, the evidence that he was impaired at any point was

isolated and general. No one suggested that if the victim did not voluntarily accompany him, he was nevertheless incapable of acting with criminal responsibility. Moreover, defense counsel was free to argue to the jury that they should not convict because defendant was so impaired that the State failed to prove that he acted with the relevant mental state. He never presented this theory to the jury.

In light of all these circumstances, we conclude beyond a reasonable doubt that the addition of an intoxication instruction would not have affected the verdict.

Defendant's next argument is related to the first. He argues that there was insufficient evidence to support the conclusion that he had the specific intent required for conviction of each of the charged crimes. He claims that the undisputed evidence of intoxication proves that he could not have formed the requisite intent. We stress again that evidence of intoxication is not necessarily proof that defendant acted without the requisite criminal intent. Here, to the contrary, there was extensive evidence that despite his consumption of drugs and alcohol, he retained the capacity to plan, reason, and remember throughout the night.

Defendant is arguing, in essence, that the State's case could not withstand a motion for acquittal. Thus, the question is "whether, taking the evidence in the light most favorable to the State and excluding modifying evidence, the State has introduced evidence fairly and reasonably tending to show the defendant's guilt beyond a reasonable doubt." *State v. Kennison*, 149 Vt. 643, 652, 546 A.2d 190, 195-96 (1987). *Kennison*, a case in which defendant also argued that evidence of intoxication and its effects meant that the State failed to prove its case, is directly on point and contrary to defendant's position. As we stated in *D'Amico*, and reinforced in *Kennison*, it is up to the jury to assess the evidence of intoxication and determine whether a defendant's "mental capacity was so diminished as to prevent him from forming the requisite felonious intent." *D'Amico*, 136 Vt. at 156, 385 A.2d at 1084-85. The evidence on degree of impairment was controverted, and defendant was not entitled to an acquittal as a matter of law. See *Kennison*, 149 Vt. at 652, 546 A.2d at 196.

Defendant's final argument stemming from the trial concerns the admission of certain expert testimony. The State called Dr. Jan Tyler to testify about rape trauma syndrome and the characteristics and conduct of rape victims. The admissibility of this testimony was first

contested in pretrial proceedings when the State made an offer of proof indicating Dr. Tyler would testify about rape trauma syndrome and "the behavioral patterns of victims of sexual assault." The State noted that the expert witness would have no contact with the victim and would not offer an opinion on whether the victim was raped by defendant. Defendant challenged the evidence as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *State v. Streich*, 163 Vt. 331, 658 A.2d 38 (1995). The court orally rejected the challenge on the first day of trial, and followed up with a written decision after the trial.

Dr. Tyler testified that rape trauma syndrome is associated with post-traumatic stress disorder — that is, it is a set of behaviors and symptoms experienced by victims of trauma. She explained that victims of severe trauma commonly experience symptoms such as nightmares, anxiety, and fear as a result of the trauma. Victims of rape, in particular, may experience symptoms such as difficulty in interpersonal relationships, guilt, shame, and sexual dysfunction.

Dr. Tyler also testified that studies have shown that victims of rape are more likely to resist their attacker by making verbal protests than by struggling or screaming, and that victims are less likely to resist if force is used or threatened. Furthermore, she said that it is not unusual for victims to delay in reporting a rape, especially if the attacker is an acquaintance, and that a rape victim may be more likely to report to a friend first, rather than to someone with whom she is having an intimate relationship. This delay in reporting is related to the feelings of guilt and shame experienced due to the trauma of the rape. Dr. Tyler then testified to statistics regarding the rate of false reporting of rape. Finally, she testified that, although she had no statistics, she thought it would not be unusual for a victim of rape to fall asleep immediately after the assault, due to the physical exertion and psychological responses to the trauma such as denial and withdrawal.

Defendant objected at the outset of the trial to the reliability and relevancy of Dr. Tyler's testimony and contended that it would impermissibly bolster the credibility of the complainant. Defendant renewed his objection to its reliability during a break in Dr. Tyler's testimony. Finally, the day after Dr. Tyler's testimony concluded, defendant objected to her testimony regarding the rate of false reports of rape. In this Court, defendant makes three arguments: (1) the court failed to conduct a proper *Daubert* inquiry; (2) the expert's evidence was not admissible under *Daubert* and *Streich*; and (3) the

expert's testimony on the rate of false reporting improperly bolstered the credibility of the victim.

At the outset we point out that most of the evidence offered by the expert, not including that about the rate of false reporting, is of the type we have found admissible in *State v. Catsam*, 148 Vt. 366, 534 A.2d 184 (1987), and its progeny, with respect to child sexual abuse. See *State v. Leggett*, 164 Vt. 599, 599-600, 664 A.2d 271, 271-72 (1995) (mem.); *State v. Gomes*, 162 Vt. 319, 329-30, 648 A.2d 396, 403-04 (1994); *State v. Weeks*, 160 Vt. 393, 399-403, 628 A.2d 1262, 1265-67 (1993); *State v. Denny*, 159 Vt. 262, 265, 617 A.2d 425, 427 (1992); *State v. Sims*, 158 Vt. 173, 178-82, 608 A.2d 1149, 1152-55 (1991); *State v. Wetherbee*, 156 Vt. 425, 430-37, 594 A.2d 390, 392-96 (1991); *State v. Gokey*, 154 Vt. 129, 133-37, 574 A.2d 766, 768-70 (1990); *State v. Hicks*, 148 Vt. 459, 461-63, 535 A.2d 776, 777-78 (1987). *Catsam* involved expert evidence describing post-traumatic stress disorder suffered by child victims of sexual assault. We held such evidence was admissible to help the jury understand the evidence because "[t]he unique psychological effects of sexual assault on children place the average juror at a disadvantage in understanding the behavior of the victim." *Catsam*, 148 Vt. at 369, 534 A.2d at 187. We amplified on the theory of admissibility in *Gokey*:

> "Profile or syndrome evidence is evidence elicited from an expert that a person is a member of a class of persons who share a common physical, emotional, or mental condition. [T]he condition must be one that is generally recognized in the field." Profile evidence is typically admitted in evidence to assist the jury in understanding "superficially bizarre behavior" of a putative victim, such as a child's ambivalence about pursuing a sexual abuse complaint, or a child's recantation of an earlier accusation. In these situations, the expert's testimony may be useful to dispel misconceptions about the behavior of victims of certain crimes and to show that the conduct of the complaining witness, however seemingly unusual, is consistent with the profile. The function of the testimony is thus primarily rehabilitative, where behaviors such as delay in reporting, recantation, or a continued relationship with the alleged abuser may be mistaken as impeaching the credibility of the child.

*Gokey*, 154 Vt. at 133-34, 574 A.2d at 768 (quoting *State v. Percy*, 146 Vt. 475, 483, 507 A.2d 955, 960 (1986)) (citations omitted and alteration in original).

Once we ruled such evidence is admissible in *Catsam*, and followed with decisions defining the outside contours of admissibility, PTSD evidence involving child victims became admissible in the trial courts. Trial judges can take judicial notice of the admissibility of such evidence. See *Johnson v. Commonwealth*, 12 S.W.3d 258, 261 (Ky. 1999).

The admissibility standard continues despite the intervening issuance of the *Daubert* decision, and the adoption of its holding in *State v. Brooks*, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993), and *State v. Streich*, 163 Vt. at 342, 658 A.2d at 46. See *Johnson*, 12 S.W.3d at 262-63 (hair comparison evidence admissible under earlier *Frye* standard remains admissible under *Daubert*; court can take judicial notice of admissibility and burden shifts to opponent to show "such evidence is no longer deemed scientifically reliable"). The basic thrust of *Daubert* is that the widely-accepted standard of novel scientific and technical evidence, announced first in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), did not survive the adoption of Federal Rule of Evidence 702, which contains a more flexible standard of reliability and relevancy. Largely because we had adopted F.R.E. 702 as V.R.E. 702, we adopted the *Daubert* standard as our own. See *Streich*, 163 Vt. at 342, 658 A.2d at 46.

We affirmed the admission of PTSD evidence in *Catsam* under V.R.E. 702 using a flexible standard of admissibility that is fully consistent with *Daubert*. See *United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir. 1993) (pre-*Daubert* analysis of DNA admissibility persuasive partly because "court employed a reliability approach to Rule 702 similar to that taken in *Daubert*"); *State v. Coon*, 974 P.2d 386, 398 (Alaska 1999) (methodologies admissible under earlier standard remain admissible under *Daubert* "absent affirmative evidence of unreliability"). Our emphasis in *Catsam* was on whether the expert evidence of PTSD, and related explanations of the typical behavior of child sexual assault victims, would "assist the trier of fact to understand the evidence." V.R.E. 702. We also drew on decisions from other states to show the evidence was reliable. See *Catsam*, 148 Vt. at 369, 534 A.2d at 187.

We recognize that *Daubert*, and the more recent decision in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), emphasized the gatekeeper function of the trial court to determine that novel scientific or technical evidence is sufficiently reliable and relevant before it is admissible. This is simply an example of the traditional role of the court to determine that evidence presented to the

fact-finder is admissible, see V.R.E. 104, and the gatekeeper can perform this function in a number of ways. In many cases, like this one and *Catsam*, the issue is whether a certain category of evidence is admissible, often in particular types of cases that are recurring. In some cases, both the trial court and this Court can fully evaluate the reliability and relevance of the evidence generally based on the decisions of other appellate courts. In this way, we can avoid conducting our own lengthy and expensive evidentiary hearing aimed at establishing, or attacking, the foundation for the disputed expert testimony.

We are not suggesting that the new standard for admissibility has somehow become general acceptance among appellate courts. Irrespective of the decisions of other courts, the responsibility for determining the admissibility of evidence in Vermont courts remains with our trial judges, and on appeal with this Court. However, scientific or technical evidence which is novel to us is frequently not novel to many other state and federal courts. See *Moore v. State*, 915 S.W.2d 284, 294 (Ark. 1996) (DNA evidence no longer novel in view of the many appellate decisions on admissibility). To the extent the evaluation of these courts is complete and persuasive, we can affirmatively rely upon it in reaching our own decision.

We have explained the application of *Daubert* in cases like *Catsam* because much of defendant's argument is that the trial court in this case failed to comply with the procedural requirements of *Daubert* — that is, that it failed to exercise its gatekeeping function by determining the reliability and relevance of Dr. Tyler's testimony based on foundational evidence presented to the court in this case. We acknowledge that we have never explicitly ruled upon the admissibility of evidence of rape trauma syndrome and the common behavior of adult rape victims, as we discuss below.[1] Thus, the trial court was required to evaluate the admissibility of Dr. Tyler's testimony, beyond her qualifications to provide such testimony, and the result of this evaluation was not clearly dictated by a decision of this Court. This does not mean, however, that the State was obligated in this case to present independent evidence that Dr. Tyler's methodology could be

---

[1] We decline the State's invitation to treat this as another child sexual abuse case because, at age 16, the victim here was a minor and not much older than the child in *State v. Noyes*, 157 Vt. 114, 116, 596 A.2d 340, 341 (1991), and other child sexual assault cases. At 16 years of age, she was beyond the age of consent under the statutory rape statute, see 13 V.S.A. § 3252(a)(3), and nothing about the crime was specifically related to her minority.

tested, was subject to peer review and publication, had a known and measurable error rate, and was generally accepted in the relevant scientific community, the factors suggested in *Daubert*.[2] Nor was the trial court required to make findings on each of these factors. It could find the evidence admissible because its reliability equals that of other technical evidence we have given trial courts the discretion to admit and the evaluation of other courts allowing admission of the evidence is complete and persuasive. This is the analysis the trial court conducted,[3] and we affirm its decision that Dr. Tyler's testimony was admissible, except for the testimony on the rate of false reporting.

■ We concur with the trial court that expert evidence of rape trauma syndrome and the associated typical behavior of adult rape victims is admissible to assist the jury in evaluating the evidence, and frequently to respond to defense claims that the victim's behavior after the alleged rape was inconsistent with the claim that the rape occurred. As with child sexual abuse victims, the jury may be at a loss to understand the behavior of a rape victim. See D. McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions*, 26 B.C. L. Rev. 1143, 1177 (1985) (discussing the use of rape trauma syndrome to explain unusual behavior of the victim); *People v. Hampton*, 746 P.2d 947, 952 (Colo. 1987) (admitting expert testimony on rape trauma syndrome to explain delay in reporting); *Rivera v. State*, 840 P.2d 933, 938-39 (Wyo. 1992) (same); *Terrio v. McDonough*, 450 N.E.2d 190, 198 (Mass. App. Ct. 1983) (explaining that it would not be remarkable for rape victim to return to scene with attacker or feel safe in his company after the

---

[2] We cite the *Daubert* factors as illustrative. As the Court stated in *Kumho Tire*, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." 526 U.S. at 141. We recognize that the State has urged us to hold that *Daubert* does not apply at all to psychological trauma syndrome evidence because it does not involve hard science capable of reliability testing by the scientific method. See *United States v. Rouse*, 100 F.3d 560, 567-68 (8th Cir. 1996), *vacated en banc*, 107 F.3d 557, *rehearing denied*, 111 F.3d 561, *cert. denied*, 522 U.S. 905 (1997). V.R.E. 702 applies, however, to "scientific, technical, or other specialized knowledge" and does not distinguish between those categories. See *Kumho Tire*, 526 U.S. at 147. The nature of the expert testimony may affect the factors to be examined bearing on reliability and relevancy; it does not change the need for such an inquiry where the scientific, technical or specialized knowledge is novel.

[3] Defendant argues that the trial court looked only to whether Dr. Tyler was qualified to give the opinion and not to the admissibility of the substance of the opinion. The trial court actually rendered three decisions, two oral and one written, on defendant's challenge and only with respect to the second decision could one say that the court confused the reliability of the evidence with the qualifications of the expert witness. Thus, the trial court's analysis was not so limited as defendant has argued.

event). For example, the defense made much of the fact that defendant's parents were close by when the sexual contact took place but heard no signs of a struggle, that the victim appeared to be sleeping peacefully in defendant's bed the next morning, and that she failed to immediately tell her boyfriend she had been raped. Dr. Tyler's testimony explained why a rape victim might exhibit these behaviors.

For the purpose the evidence was used here, it is sufficiently reliable to be admitted. See, e.g., *People v. Taylor*, 552 N.E.2d 131, 134-35 (N.Y. 1990). Rape trauma syndrome is professionally recognized as a type of post-traumatic stress disorder, and the behavioral characteristics of rape victims has been the subject of numerous professional studies. See generally Note, *"Lies, Damned Lies, and Statistics"? Psychological Syndrome Evidence in the Courtroom After Daubert*, 71 Ind. L.J. 753, 760-61 (1996). As the trial court noted in this case, Dr. Tyler was prepared to address some of the studies that formed the bases for her opinions if the defendant raised them in cross-examination.

We note that the evidence here was of a type that the danger of improper usage or excessive prejudice was at a minimum. The expert never interviewed the victim and offered no opinion whether the victim suffered from rape trauma syndrome or exhibited any of the behavior of a rape victim.[4] Thus, there was little risk that Dr. Tyler would be seen as a truth detector. See *Gomes*, 162 Vt. at 330, 648 A.2d at 404.

---

[4] In a twist, defendant suggests that Dr. Tyler's testimony was inadmissible because she did not address whether the victim suffered from the syndrome and did not tie the syndrome to the testimony on the common behavior of rape victims, some of which related to how victims react during the rape before any syndrome developed. We reiterate the point of *State v. Wetherbee*, 156 Vt. at 433, 594 A.2d at 394, that the opinions of experts who have examined the victim are much more likely to be seen as vouching for the victim's story than the opinions of experts who have never examined the victim. See also *Gomes*, 162 Vt. at 330, 648 A.2d at 404. Moreover, the common behaviors of rape victims are directly related to the rape trauma syndrome in the sense that the stress reaction creates a profile. This testimony has been the least controversial of the expert evidence related to rape trauma syndrome. Some courts and commentators have concluded that rape trauma syndrome evidence should be admissible solely for this purpose. See *People v. Taylor*, 552 N.E.2d at 138; K.W. Gaines, *Rape Trauma Syndrome: Toward Proper Use in the Criminal Trial Context*, 20 Am. J. Trial Advoc. 227, 251 (1997).

Finally, we do not find a line between behavior during the rape and behavior after the rape has been drawn for purposes of the syndrome. Dr. Tyler testified to behavior of rape victims during the rape as part of the syndrome.

We do not, however, have the same view of the expert's testimony about the incidence of false reporting by rape victims. The prosecutor asked Dr. Tyler whether "there are any data on the issue of false reporting that you are aware of?" She answered:

> False reporting, the percentages are very low. About two percent. That's about the same as any other crime that's committed. In other words, the number of people who would report a burglary that didn't happen is about the same as people who would report a rape, with one difference. The statistics for the rape include those reports that are made and then either withdrawn by the victim for whatever reason, either they were false or there's a fear of going through the legal system, or they're being pressured by other persons. Those also include reports that the police will not arrest on because they don't feel they have enough evidence. And they also include those that don't get to trial because the prosecutor feels it's not a winnable case. So when you get down to literal false reporting of this really never happened, it's very small.

In short, Dr. Tyler testified that at least 98% of the rapes reported actually occurred.

In *State v. Percy*, 146 Vt. at 484, 507 A.2d at 960, a rape case in which defendant claimed amnesia caused by insanity and consent of the victim, three psychiatrists testified for the State that rapists typically claim consent or amnesia. We reversed defendant's conviction in part because of the admission of this testimony. We concluded that explanations or excuses offered by other rapists were not relevant, and, in any event, the prejudicial effect of the testimony outweighed the probative value because the jury could have convicted defendant because "he fit the mold" and not because of the evidence in the case. *Id.*

Similarly, in *Catsam*, 148 Vt. at 371, 534 A.2d at 188, we found inadmissible an expert's opinion that child victims of sexual abuse do not make up stories of the abuse. As in this case, the evidence was offered as part of the expert's explanation of the typical behavior of victims. We concluded that the expert testimony was tantamount to an expert opinion that the victim was telling the truth and that it invaded the proper role of the jury. See also *Weeks*, 160 Vt. at 400, 628 A.2d at 1266 (expert's role as truth detector, implicitly vouching for credibility of victim, is improper); *Wetherbee*, 156 Vt. at 431, 594 A.2d at 393 (same); *Gokey*, 154 Vt. at 140, 574 A.2d at 771-72 (same).

■ Dr. Tyler's testimony on the rate of false reporting clearly went over the line as explained in *Percy* and *Catsam*. The jury could infer from her testimony that scientific studies have shown that almost no woman falsely claims to have been raped and convict defendant on that basis.

Although the evidence of the incidence of false reporting of rape accusations was inadmissible and prejudicial, the State argues that its admission is not grounds for reversal because defendant failed to object specifically to this evidence. As set out above, defendant objected generally to the testimony of Doctor Tyler on the ground that it did not meet the two-part test of *Daubert*. The court denied this objection, and defendant raised no objection to any specific part of Dr. Tyler's testimony while it was being given. At the start of trial on the next day, defense counsel indicated that he had thought about the testimony overnight and moved to strike the testimony dealing with false reporting. The court denied the motion as too late. The State argues that the motion was untimely and, therefore, was properly denied.

■■ In order to preserve a claim of error in the introduction of evidence, the party opposing introduction must make "a timely objection or motion to strike." V.R.E. 103(a)(1). This means that "[t]he objection must have been made at the time the evidence was offered or the question was asked." *State v. Fisher*, 167 Vt. 36, 43, 702 A.2d 41, 45 (1997). A motion to strike must also be timely. Ordinarily, it must be made when the grounds for it become apparent. See *State v. Archbold*, 350 N.W.2d 500, 505 (Neb. 1984). We conclude that the trial court here acted well within its discretion in finding the motion to strike untimely. Accordingly, defendant's challenge to the admission of the false reporting evidence has not been properly preserved for appeal. See *State v. Crannell*, 170 Vt. 387, 398, 750 A.2d 1002, 1012 (2000).

■ Despite defendant's failure to preserve this issue for appeal, we can review defendant's claim for plain error. See V.R.Cr.P. 52(b). Plain error exists only in exceptional circumstances where the failure to recognize it would result in a miscarriage of justice or where the error is so grave and serious that it strikes at the heart of defendant's constitutional rights. See *State v. Mears*, 170 Vt. 336, 341, 749 A.2d 600, 604 (2000). We have occasionally found plain error because of improper testimony by an expert on PTSD in a child sexual abuse prosecution, see *Weeks*, 160 Vt. at 403, 628 A.2d at 1267, although

more often we have not found plain error. See *Sims*, 158 Vt. at 182, 608 A.2d at 1155; *State v. Ross*, 152 Vt. 462, 470, 568 A.2d 335, 340 (1989).

The closest case to this one is *State v. DeJoinville*, 145 Vt. 603, 604-05, 496 A.2d 173, 174-75 (1985), in which the minor victim's pediatrician testified without objection that children would not lie about being sexually abused. We did not find the testimony to be plain error. See also *State v. Calloway*, 157 Vt. 217, 221-22, 596 A.2d 368, 371-72 (1991) (no plain error in refusing to declare mistrial when State's expert witness testified that children who make accusations of sexual abuse generally tell the truth). In contrast is *Weeks*, the one case in which we did find plain error. In that case, the expert testified to the general behavior of sexual abuse victims and then went into the behavior of the victim in the criminal case before the court. We described his testimony as follows:

> [H]is testimony is a richly detailed roadmap of how he elicited and came to believe the child's allegations of abuse. From the outset, the jury knew, not only that he had personally examined the victim, but that he had tested her perceptions and credibility, and, that based on his conclusions, he reported the abuse and defendant as the perpetrator to SRS. He not only vouched for the victim's credibility but staked his professional reputation on it. When Dr. Cunningham was finished testifying, no one could reasonably doubt that he had given his unqualified endorsement to the child's believability.

*Weeks*, 160 Vt. at 401, 628 A.2d at 1266.

This case exhibits none of the hallmarks of *Weeks*. Dr. Tyler never testified about the story or credibility of the victim because she had never interviewed, or even met, the victim. Her testimony was entirely theoretical as in *DeJoinville*. See *Wetherbee*, 156 Vt. at 433, 594 A.2d at 394 (comments of expert who has examined the victim are taken in an entirely different light by the jury). Further, defense counsel was able to reduce the prejudicial effect of the testimony of the low incidence of false reporting by cross-examination. Finally, the prosecutor did not highlight this testimony in closing argument.

 We cannot conclude that failure to exclude the inadmissible expert testimony caused a miscarriage of justice in this case. Accordingly, we find no plain error.

■ Defendant's remaining arguments on appeal relate to the sentencing phase of the proceeding. Defendant first argues that his concurrent sentences of forty-years-to-life on the kidnapping and aggravated assault charges are grossly excessive and disproportionate to the crimes, violating his right to due process of law. This sentencing issue was not preserved for appeal because defendant failed to object to the sentence in the trial court. See *State v. Francis*, 152 Vt. 628, 632, 568 A.2d 389, 392 (1989); *State v. Nash*, 144 Vt. 427, 435, 479 A.2d 757, 762 (1984) (objection to sentencing cannot be raised for first time on appeal).

Defendant's second argument relating to his sentence is that it exceeds the statutory maximum. The kidnapping statute, 13 V.S.A. § 2405(b), provides an "affirmative defense" to reduce the maximum penalty for violation from life imprisonment to thirty years imprisonment if the defendant voluntarily released the victim alive in a safe place without having caused serious bodily injury to the victim. See 13 V.S.A. § 2405(b). Shortly before trial, the parties in this case signed and filed with the court a written stipulation, providing, among other things:

> For purposes of sentencing, pursuant to 13 V.S.A. § 2405(b), the court may find that the defendant voluntarily released [the victim] alive in a safe place before arraignment without having caused serious bodily injury to [the victim]. This provision of the stipulation shall not be read to the jury.

Defendant argues that the stipulation bound the court to impose a sentence no greater than thirty years because the parties had agreed that the "affirmative defense" had been established. The State responds that voluntary release is an affirmative defense that must be presented to the jury. In the absence of a jury determination, it argues, defendant has waived the issue.

Defendant's argument is premised on his view that the State had conceded that he had voluntarily released the victim without having caused her serious bodily injury. We cannot read the stipulation as having that meaning. At best, the stipulation authorizes the trial judge to find that defendant voluntarily released the victim without serious bodily injury, but does not require such a finding. It assumes, however, that the factual determination will be made by the judge and not the jury, an assumption the State now argues is misguided.

■ We agree that the statute requires a jury determination to invoke the voluntary release defense. Although the judge determines

the sentence, *State v. Goyet*, 120 Vt. 12, 52, 132 A.2d 623, 649 (1957), it is the jury's responsibility to determine what crime, if any, has been committed. A defense is "any set of identifiable conditions or circumstances that may prevent conviction for an offense." 1 P. Robinson, Criminal Law Defenses § 21, at 70 (1984). Because the Legislature designated voluntary release as an affirmative defense, defendant has the burden of proof to establish it. See *State v. Davis*, 165 Vt. 240, 247, 683 A.2d 1, 6 (1996). In essence, the statute creates two different crimes: the crime of kidnapping with a maximum punishment of life in prison, and the crime of kidnapping with mitigating circumstances, with a maximum punishment of thirty years in prison. If defendant wanted to achieve the result he now says was intended, he had to induce the State to lower the charge to the latter crime, cf. *id.* at 244, 683 A.2d at 6 (State amended the charge to "mitigated kidnapping" subject to maximum penalty of thirty years), or to obtain a judicial determination that the affirmative defense had been established as a matter of law. He did neither.

This does not mean that the stipulation had no effect. Obviously, the fact that defendant released the victim voluntarily and unharmed could have bearing on the sentence the court chose to impose, as shown by legislative recognition of this factor. The stipulation allowed defendant to argue that the State had conceded this factor and, by its terms, was made specifically to influence sentencing. Defendant failed, however, to make any use of the stipulation at sentencing. As a result, we find no error in the failure of the court to consider it.

*Affirmed.*