NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 87

No. 2020-297

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windham Unit, |
| | Criminal Division |
| | |
| Elizabeth MacFarland | September Term, 2021 |

Katherine A. Hayes, J.

David Tartter, Deputy State's Attorney, Montpelier, for Plaintiff Appellee.

Matthew Valerio, Defender General, and Joshua S. O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Robinson,[1] Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Defendant Elizabeth MacFarland appeals convictions for resisting arrest and unlawful trespass following a bench trial in which the trial court refused to consider her diminished-capacity defense. Relying on Vermont Rule of Criminal Procedure 12.1 and its own scheduling and discovery order, the trial court found that defendant failed to properly notify the State of her intention to argue diminished capacity. Defendant argues that the plain meaning of Rule 12.1 does not require notice of diminished capacity when a defendant does not rely on expert witnesses, that the trial court's scheduling order did not independently provide a basis for notice, and that, as charged, the notice element of misdemeanor unlawful trespass denotes a subjective

---

[1] Justice Robinson was present for oral argument but did not participate in this decision.

standard. We agree that the trial court erred in refusing to consider diminished capacity and that the error was not harmless. Accordingly, we reverse and remand.

¶ 2. The following evidence was presented at trial. On the evening of December 21, 2018, defendant visited Arkham Bar in Brattleboro. During her stay at the bar, which lasted about an hour, defendant purchased a large bottle of champagne and proceeded to drink much of its contents. Soon thereafter, defendant became disruptive, and the bar's bouncer confronted defendant. He asked defendant to talk with him outside. In apparent response to the bouncer's question, defendant spoke incoherently about politics and her family. The bouncer persisted and again asked her to speak with him outside. Defendant refused. The bouncer then pulled on defendant's bar stool and told her she "had to leave." Defendant stood up from her stool, ran to a corner, and muttered to herself. Soon thereafter, the bouncer called the police, and two Brattleboro police officers arrived a few minutes later.

¶ 3. Sergeant Jason Hamilton asked defendant "to come outside to talk to him." She refused, and while remaining on the floor in a corner, "deflected" the officers' order by speaking about her cell phone, which she held in her hand. Sergeant Hamilton stood defendant up by her arm, at which point defendant went completely limp. The officers were forced to carry defendant from the bar. As they did, defendant yelled that the officers were doing so because she had a high IQ and, therefore, they could not understand her. Defendant also began to curse loudly.

¶ 4. Once outside, the officers put defendant on the ground and tried to handcuff her hands behind her back. The officers also tried to remove defendant's purse, which was slung over her arm. Defendant continued screaming loudly. She screamed that the officers were arresting her because "they were misogynistic and part of a patriarchal police structure." Defendant screamed that the officers were too stupid to speak with her because her IQ was unusually high. More officers arrived. Shortly after that, defendant ripped a piece of plastic off a police cruiser

2

during the struggle to restrain her. Eventually the officers subdued defendant and placed her, handcuffed, into a police cruiser.

¶ 5. Defendant was charged with four misdemeanors, two of which defendant appeals.[2] Defendant was charged with unlawful trespass by "remain[ing] . . . in any place as to which notice against trespass is given by . . . actual communication by the person in lawful possession or his or her agent." 13 V.S.A. § 3705(a)(1)(A). The State also charged defendant with resisting arrest by "intentionally attempt[ting] to prevent a lawful arrest on [] herself." Id. § 3017(a)(1).

¶ 6. Defendant was arraigned on Monday, December 24, 2018. On that same date, the trial court issued a scheduling and discovery order to the parties that read, in part, "[d]efendant's attorney shall give notice of alibi, insanity, or diminished capacity defenses in the form required by V.R.Cr.P. 12.1(b) within no later than 30 calendar days." The matter proceeded to a bench trial.

¶ 7. On cross-examination during the one-day trial, defense counsel questioned Sergeant Hamilton about defendant's preliminary breath test administered at the police station. The State objected that preliminary breath test results were not admissible; defense counsel agreed but asserted that he was only interested in establishing that defendant was intoxicated, and the extent to which the breath test result indicated the presence of alcohol was admissible for that purpose. Furthermore, defense counsel noted that lay testimony is admissible to establish

---

[2] Defendant was acquitted of unlawful mischief under 13 V.S.A. § 3701(c) and found guilty of disorderly conduct under 13 V.S.A. § 1026(a)(1). Defendant did not preserve an objection as to whether diminished capacity is a defense to disorderly conduct, as prosecuted, under § 1026(a)(1). At oral argument, defendant's appellate counsel appeared to suggest that defendant's disorderly conduct conviction, which was prosecuted under a theory of recklessness, could be challenged by a diminished capacity defense. However, at trial, defense counsel expressly conceded that reckless disorderly conduct "will not be covered by diminished capacity defense in any event." Defendant likewise does not argue the point in her briefing before this Court. As a result, we have no developed record on the question, and we decline the invitation to review it now. See TD Banknorth, N.A. v. Dep't of Taxes, 2008 VT 120, ¶ 33, 185 Vt. 45, 967 A.2d 1148) ("We will not address arguments raised for the first time at oral argument, and so decline to consider this claim.").

intoxication. The trial court agreed and then asked defense counsel whether he was making a diminished-capacity argument. Counsel replied that he was. The trial court asked whether the State had been notified of defendant's intention to pursue a diminished-capacity defense. The State replied that it had not received notice. Defense counsel asserted that no notice was required under the plain language of Rule 12.1. Defense counsel maintained that Rule 12.1 requires notice only in the event a defendant intends to call expert witnesses to support the defense.

¶ 8. After hearing the State's objections and defense counsel's explanation as to why no notice was required, the trial court initially concluded that it "may or may not consider the diminished capacity defense, depending on the decision about this notice issue. But go ahead and continue your line of questioning." Defense counsel resumed. In response to counsel's question about the preliminary breath test, Sergeant Hamilton said that he administered the test, and it indicated the presence of alcohol, but he did not recall the results.

¶ 9. Defense counsel called another officer to testify when presenting its case, Sergeant Stanley, who engaged with defendant outside the bar. Defense counsel and Sergeant Stanley participated in the following colloquy:

> DEFENSE COUNSEL: Did [defendant] appear to be under the influence of alcohol on the evening of December 21?
>
> SERGEANT STANLEY: Yes, she did.
>
> DEFENSE COUNSEL: And how do you know that? Or what forms the opinion?
>
> SERGEANT STANLEY: Based off the circumstantial evidence of where she was at the time of the call, statements that I later provided that she was consuming[,] or was given to me that she was consuming alcohol, her yelling, her erratic behavior, the screaming, general disorderly behavior.
>
> DEFENSE COUNSEL: Okay. And so these are signs of impairment that you associate with being under the influence of alcohol?

4

SERGEANT STANLEY: Inability to follow directions, not listening to directions, being combative with law enforcement. Yes, they are.

DEFENSE COUNSEL: Okay. Was [defendant] responding to officers' requests?

SERGEANT STANLEY: No, she was not.

¶ 10. After a recess, the trial court determined that defense counsel failed to properly notify the State of its diminished capacity defense under Rule 12.1 and pursuant to the December 24 scheduling order. As a sanction, the trial court refused to consider diminished capacity. Defense counsel objected.

¶ 11. During summary arguments, defense counsel argued that the words "actual communication" in the unlawful trespass statute meant "that there's got to be not only a statement made to that individual, but that individual needs to be able to comprehend what that statement is for that to be actually communicated." Counsel argued that the words communicated to defendant by the bouncer and the police officers were vague and not statements telling defendant she needed to leave the bar. However, because defense counsel could not raise the issue of diminished capacity, he did not argue that defendant did not actually perceive the bouncer's and the officers' statements.

¶ 12. The trial court found defendant guilty of unlawful trespass and resisting arrest. Regarding the unlawful trespass charge, the court concluded that because the bouncer "instructed" defendant that she needed to leave the bar, defendant "therefore remained in the bar despite being instructed that she was trespassing." The court also concluded that defendant intentionally resisted arrest. Defendant, the court found, "was aware that the officers were in fact uniformed police. In fact, during her resistance, she referred to that status."

## I. V.R.Cr.P. 12.1

¶ 13. We begin with defendant's first argument on appeal, whether the plain language of Rule 12.1 required her to notify the State that she intended to rely on a diminished-capacity defense

5

at trial.[3]  "Procedural rules have statutory force."  State v. Gurung, 2020 VT 108, ¶ 23, __ Vt. __, 251 A.3d 572 (citation omitted).  The interpretation of procedural rules, therefore, is a "question of law which we review de novo."  State v. Amidon, 2008 VT 122, ¶ 16, 185 Vt.1, 967 A.2d 1126.  "In construing a procedural rule, we look first to the rule's plain language, just as with statutory construction."  State v. Villar, 2017 VT 109, ¶ 7, 206 Vt. 236, 180 A.3d 588.  Specifically, we look to the "plain, ordinary meaning" of the words themselves.  Id. (citation omitted).

¶ 14.  Rule 12.1(a) provides in relevant part:

> A defendant who wishes to offer an alibi, raise the issue of insanity or offer expert testimony relating to a mental disease, or defect or any other mental condition of the defendant bearing upon the issue of his or her guilt must give written notice thereof, together with the information required by subdivision (b) of this rule, to the prosecuting attorney on the date of the status conference, or at least 28 days prior to trial, whichever is sooner.

V.R.Cr.P. 12.1(a).  At trial, the court concluded that Rule 12.1(a) "does require notice of a diminished capacity defense, and on the other hand it also appears very clear that expert testimony is not required.".  While the trial court was correct that Rule 12.1(a) does not require expert testimony to present a diminished capacity defense, it erred by reading a notice requirement for diminished capacity into the rule.

¶ 15.  First, the words "diminished capacity" do not appear in Rule 12.1.  State v. Hale, 2021 VT 18, ¶ 10, __ Vt. __, 256 A.3d 595 ("It is a well-settled principle of statutory construction that we will not read words into a statute that are not there, unless it is necessary in order to make [the statute] effective." (quotation omitted)).  In fact, the words "diminished capacity" have never appeared in Rule 12.1, dating from the rule's first appearance in 1973.

---

[3] In Vermont, voluntary or involuntary "[i]ntoxication may affect a person's ability to form the mental state requisite for conviction of certain crimes."  State v. Kinney, 171 Vt. 239, 243, 762 A.2d 833, 837 (2000).  A defendant may introduce evidence of intoxication showing that they could not have formed the necessary intent.  Id.  A diminished-capacity defense, therefore, "is an attempt to defeat the State's obligation to show the necessary intent to commit the crime."  State v. Webster, 2017 VT 98, ¶ 20, 206 Vt. 178, 179 A.3d 149.

¶ 16.    Second, the first sentence of 12.1(a) begins by identifying the situations that come under the rule: "[a] defendant who wishes to offer an alibi, raise the issue of insanity or offer expert testimony relating to a mental disease, or defect or any other mental condition." V.R.Cr.P. 12.1(a) (emphasis added). In other words, Rule 12.1 requires notice by defendants who intend to rely on an alibi or insanity defenses, and by defendants who intend to introduce expert testimony relating to a mental disease or condition. It does not govern defendants who do not fit these criteria.[4]

¶ 17.    The State points to prior decisions of this Court for the proposition that Rule 12.1 does, in fact, require notice of diminished capacity even without expert testimony. The State first refers us to State v. McKenzie, an unpublished memorandum decision from 2005. No. 2004-447, 2005 WL 6152654, *2 (Vt. Aug., 2005) (unpub. mem.), https://www.vermontjudiciary.org/sites/default/files/documents/eo04-447.pdf [https://perma.cc/ET3Q-WUNJ]. In McKenzie, the defendant argued, for the first time on appeal, that she was deprived of a "potential" diminished capacity defense. We responded to the defendant's unpreserved argument—that she was unable to argue a hypothetical defense—by saying, "[t]here is no indication that [the] defendant intended to claim diminished capacity at trial. In fact, [the] defendant failed to file a notice of such pursuant to V.R.Cr.P. 12.1." Id. This dicta was not meant to suggest that notice was required to present a diminished capacity defense at trial. Rather, it was intended to reinforce the observation that the defendant could not point to anything in the record suggesting that she intended to rely on diminished capacity.

¶ 18.    The State also asks us to read State v. Duford, 163 Vt. 630, 660 A.2d 736 (1995) (mem.), as requiring defendants to provide notice of diminished capacity under Rule 12.1. But Duford does not help the State, and, indeed, stands for the opposite conclusion. In Duford, we

---

[4] The State counters that the Reporter's Notes say otherwise. However, when the meaning of a procedural rule is plain on its face, we need not, and do not here, look to the Reporter's Notes to discern the meaning of a rule. See State v Burnham, 145 Vt. 161, 164, 484 A.2d 918, 921 (1984) ("Defendant argues that the language of the Rule itself should control over the views expressed in the Reporter's Notes. We agree with this as a general principle.").

discussed whether the trial court erred in denying a defendant's diminished capacity jury instruction because the "defendant had failed to give proper notice under V.R.Cr.P. 12.1 and because there was insufficient evidence to warrant the charge." Id. at 631, 660 A.2d at 737. We concluded that the trial court correctly refused the instruction because "there was insufficient evidence to justify it." Id. We recognized that while "expert testimony is [not] necessary to show diminished capacity," "[t]he testimony of [the] defendant's mother . . . was insufficient to establish [the] defendant's diminished capacity." Id. Thus, while we did not say as much, this Court inferred that the defendant's mother, who testified as to the defendant's diminished capacity without prior notice to the State, could have provided sufficient evidence at trial to support a diminished-capacity defense. The inference remains equally valid now as it did then—diminished capacity defenses do not require notice if the defendant does not intend to call expert witnesses to support the defense.

## II.  The Trial Court's Scheduling Order

¶ 19.    The State argues that even if Rule 12.1 permitted defendant to present a diminished capacity defense at trial, the trial court's scheduling and discovery order did not.  The State argues that trial courts, under Rule 12(e), have an overriding authority to issue orders relating to discovery in criminal proceedings, irrespective of other criminal rules.  Defendant urges us to hold the scheduling order was invalid as written because it failed to include a sanction for violating the scheduling order, and the trial court's subsequent preclusion of defendant's defense was disproportionate.  Defendant also argues that Rule 12.1(a) is more specific than Rule 12(e) and is therefore controlling.  We agree with defendant that the scheduling and discovery order did not require her to notify the State of an intent to rely on diminished capacity, but we agree on different grounds.

¶ 20.    The trial court issued a scheduling and discovery order on the same day defendant was arraigned.  The order was titled "Week of 12/24/2018," and was apparently a generalized

order used by the criminal division for that week's misdemeanor arraignments. The scheduling order required defense counsel to "give notice of alibi, insanity, or diminished capacity defenses in the form required by V.R.Cr.P. 12.1(b) within no later than 30 calendar days." At trial, the court told defense counsel that the scheduling "order specifically does cover [notice of diminished capacity]." The trial court opined that the day of the trial was too late to raise diminished capacity because the State "had absolutely no opportunity to talk to other witnesses regarding whether or not [defendant] was [so] impaired [that she did not have the] ability to form the necessary intents." Defendant objected that there was no prejudice to the State because the only testimonial evidence relating to diminished capacity was elicited from State witnesses, and that alcohol clearly played a prominent role in the case.

¶ 21. The superior courts have wide latitude to "enter such orders as may be necessary in order to ensure the orderly progression of the proceedings." V.R.Cr.P. 12(e). Here, however, the operative language in the scheduling order was that defendant had to notify the State of her intention to raise diminished capacity "in the form required by V.R.Cr.P. 12.1(b)." But Rule 12.1(b) does not require any form of notice of a diminished capacity defense to be established without expert testimony. Furthermore, while Rule 12.1(b) <u>does</u> require notice "in the form" of "a written statement," that is <u>only</u> the case when a defendant intends to "give[] notice of an alibi . . . [when] the defendant gives notice that sanity is in issue . . . or [a defendant] will use expert testimony as provided in [Rule 12.1(a)]." V.R.Cr.P. 12.1(b).[5] In other words, nothing in

---

[5] Rule 12.1(b) provides in full:

> When the defendant gives notice of an alibi, he shall provide with the notice a written statement of the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of witnesses upon whom he intends to rely to establish such alibi. When the defendant gives notice that sanity is in issue or he will use expert testimony as provided in subdivision (a), he shall provide with the notice a written statement of the names and addresses of the witnesses he intends to call to provide expert testimony or to raise the issue of sanity.

9

Rule 12.1(b) required defendant to give notice "in the form required by Rule 12.1(b)" because she was not seeking to introduce expert testimony to support her diminished capacity argument. Therefore, because we conclude that the order did not require notice of the diminished capacity defense as written, we do not reach the merits of defendant's argument concerning whether the trial court's sanction was disproportionate.

¶ 22. We are mindful of the wide latitude that must be afforded to the superior courts to conduct proceedings in ways they deem appropriate. We do not in any way intend to limit that considerable discretion. To be clear, our holding on this point is a narrow one: we hold merely that Rule 12.1 does not require defendants to provide advance notice of an intent to argue diminished capacity when the defendant does not intend to call expert witnesses to testify in support of the defendant's diminished capacity.

### III. Harmless Error

¶ 23. We now turn to defendant's final argument that the trial court's refusal to consider diminished capacity in convicting defendant for resisting arrest and unlawful trespass constitutes reversible error. Criminal Rule 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." To conclude that an error is harmless, we must find the error's "effect was harmless beyond a reasonable doubt." State v. Sweeney, 2005 VT 11, ¶ 14, 178 Vt. 1, 869 A.2d 137. Here, we cannot conclude beyond a reasonable doubt that the trial court's error in precluding defendant's diminished capacity theory was harmless.

¶ 24. It is well-established in Vermont that voluntary intoxication can form the basis of a diminished capacity defense. See State v. Congress, 2014 VT 129, ¶¶ 30-33, 198 Vt. 241, 114 A.3d 1128 (citing cases affirming that evidence of intoxication is basis for diminished capacity defense to crimes containing specific intent elements); State v. Kinney, 171 Vt. 239, 243, 762 A.2d 833, 837 (2000) ("Intoxication may affect a person's ability to form the mental state requisite for

10

conviction of certain crimes."). Diminished capacity "is an attempt to defeat the State's obligation to show the necessary intent to commit the crime." State v. Webster, 2017 VT 98, ¶ 20, 206 Vt. 178, 179 A.3d 149. Thus, "where there is evidence of intoxication such as to negate the requisite criminal intent, the court should normally . . . consider the intoxication evidence as bearing on intent." Kinney, 171 Vt. at 243, 762 A.2d at 837. However, "intoxication is not a defense unless it reaches the point where [the] defendant fails to achieve the state of mental responsibility required by the charge." Id. at 244, 762 A.2d at 837. For this reason, without more, "evidence of alcohol or drug consumption, even in large quantities, will not by itself require the court" to consider the evidence. Id.; see also State v. Cameron, 514 A.2d 1302, 1309 (N.J. 1986) (listing factors to determine whether evidence supports diminished capacity defense, including "quantity of intoxicant consumed, period of time involved, the actor's conduct as perceived by others . . . any odor of alcohol or any other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events").

¶ 25. The evidence presented at trial confirms that defendant's alcohol consumption may have been a significant factor in her conduct on the evening in question and that a court might conclude this evidence supported a diminished capacity defense. Defendant consumed nearly two liters of wine in less than an hour. Defendant testified that she blacked out in the bar. Defendant did not form coherent responses to questions and directions put to her by either the bouncer or the police officers. Moreover, at trial, with the permission of the court after the State objected, defense counsel established on cross-examination that Sergeant Hamilton administered a preliminary breath test and that it indicated the presence of alcohol. Another officer, in response to defense counsel's questioning, replied that defendant's "yelling, her erratic behavior, the screaming, [her] general disorderly behavior [which included an] inability to follow directions, [and] not listening to directions" were all indicative of defendant's intoxication.

11

¶ 26.    The State argues that the trial court's preclusion of diminished capacity, if error, was nevertheless harmless, because diminished capacity "is the other side of the coin" of the State's burden to prove the mental state elements.  The State points to various places in the trial record as evidence that the court acknowledged defendant's intoxication with respect to the mental state elements, and other places where the court heard arguments from defense counsel regarding defendant's intoxication.  However, the State's argument misunderstands the difference between evidence of intoxication, of which the trial court undoubtedly considered some quantum, and a theory of diminished capacity that defendant could not form the requisite mental state to commit the crimes with which she was convicted, which the trial court precluded as a sanction for failing to provide notice.

¶ 27.    The court did discuss "defendant's obvious intoxication" when it concluded that defendant was guilty of disorderly conduct because, even though she was intoxicated, she acted recklessly because she "was aware of . . . the risk [that her conduct would cause public inconvenience] and [still] chose to scream at the top of her lungs."  However, the court did not discuss defendant's intoxication with respect to either the unlawful trespass charge or the resisting arrest charge, both of which, we conclude, contain specific intent mental elements.

¶ 28.    It is undisputed that the resisting arrest charge contains a specific intent element; namely, that defendant "intentionally attempted to prevent a lawful arrest on herself."  The court found that defendant "was aware" she was being arrested by law enforcement because "she referred to their status" as such when she screamed that they were "misogynistic and part of a patriarchal police structure."  The State argues that, in light of the fact that "[n]othing in the trial court's ruling suggests that defendant's mental state was a close question," any error is harmless because defendant's burden to prove diminished capacity by a preponderance of the evidence cannot change the outcome.  But defendant does not bear the burden to "prove" diminished capacity by any standard; the burden remains with the State to prove beyond a reasonable doubt

that defendant formed the necessary criminal intent. See Webster, 2017 VT 98, ¶ 20 (explaining that defendants bear burden to prove insanity by preponderance of evidence, but State bears burden to prove mental elements when challenged by diminished capacity defense). Thus, we cannot conclude beyond a reasonable doubt that the absence of any discussion of defendant's intoxication, much less under a theory of diminished capacity that she could not have formed the requisite mental intent, would not tend to negate the State's burden of proof that defendant formed the necessary intent to resist arrest.

¶ 29. Next, defendant argues that the plain language of 13 V.S.A. § 3705(a)(1)(A), unlawful trespass, denotes a subjective standard. The State counters that we already decided the issue in State v. Richards, 2021 VT 40, __ Vt. __, 256 A.3d 94, when we "decline[d] to imply a knowledge requirement into the license element of section 3705(a)." The State also argues that defense counsel's theory of the case did not rely on a mental element, but instead relied on inadequate notice.

¶ 30. "The interpretation of a statute is a question of law that we review de novo." State v. Therrien, 2011 VT 120, ¶ 9, 191 Vt. 24, 38 A.3d 1129. And we begin, where possible, with the "plain, ordinary meaning" of the statute. Id. We do this to effectuate the Legislature's intent which is, above all, our "overriding objective." State v. Dixon, 169 Vt. 15, 17, 725 A.2d 920, 922 (1999) (quotation omitted).

¶ 31. The criminal trespass statute, "[r]ead as a whole, . . . lays out several trespass offenses, distinguished by the location of the offense and the resulting punishment, and thus creates a cohesive statutory scheme." Richards, 2021 VT 40, ¶ 26. Section 3705(a), the misdemeanor section of the statute, distinguishes between three types of notice for trespassers: (1) notice by "actual communication" under § 3701(a)(1)(A); (2) by "signs or placards" under § 3701(a)(1)(B); and (3) by similar, though not identical methods, in the case of "abandoned property" under

§ 3705(a)(1)(C) and (a)(2). We are, of course, concerned only with "actual communication" in § 3705(a)(1), and it is worthwhile to recite this portion of the statute in its entirety:

> (a)(1) A person shall be imprisoned for not more than three months or fined not more than $500.00, or both, if, without legal authority or the consent of the person in lawful possession, he or she enters or remains on any land or in any place as to which notice against trespass is given by:

> (A) actual communication by the person in lawful possession or his or her agent or by a law enforcement officer acting on behalf of such person or his or her agent . . .

Section 3705(a)(1)(A), therefore, contains four elements: (1) notice to defendant by "actual communication" by specific persons, including law enforcement under certain circumstances; (2) defendant entered or remained in a place despite the notice; (3) defendant had no legal authority to do so; (4) defendant did not have consent of the person in lawful possession. See Dixon, 169 Vt. at 17, 725 A.2d at 923.

¶ 32. In State v. Pixley, we held that the form of notice by "signs or placards so designed and situated to give reasonable notice" created an objective standard. 2018 VT 110, ¶ 13, 208 Vt. 529, 200 A.3d 174 (quoting 13 V.S.A. § 3705(a)(1)(B)). In other words, whether a person actually notices the "signs or placards" while trespassing is irrelevant. We explained that we reached this conclusion "foremost" by looking at the plain language of the statute. Id. ¶ 14. We said that "the Legislature separated 'actual communication' from 'reasonable notice,' " indicating that "the two options were meant to convey different standards." Id. We said that "[i]f the Legislature had intended that the State prove [the] defendant's subjective knowledge of the signs, it would have used 'actual notice' in reference to signage and not 'reasonable notice.' " Id.

¶ 33. More recently, in Richards, we held that the requirement that the defendant had no legal authority to enter or remain did not contain an implied knowledge component. 2021 VT 40, ¶ 26. We noted that even though there was no implied knowledge element in § 3705(a), the combination of the requirement of notice and the requirement that the person lack legal authority

14

acted as a "functional equivalent to a knowledge element." Id. ¶ 25. Citing Pixley's objective standard for the "signs or placards" form of notice, we acknowledged "that the notice element does not serve as an exact substitute for knowledge in all instances under § 3705." Id. We expressly left open the possibility that "Pixley could be read to suggest that 'actual communication' denotes a subjective standard." Id. ¶ 25 n.3 (citing Pixley, 2018 VT 100, ¶ 14). Therefore, the State is incorrect that Richards controls the outcome here. We are not concerned with the element in § 3705(a) relating to the defendant's authority to enter or remain on the premises; we are concerned with the notice element in § 3705(a)(1)(A).

¶ 34. The question is whether the notice element in the unlawful trespass statute can denote a subjective standard if the notice is given by "actual communication." As we have intimated in recent cases looking at 13 V.S.A. § 3705(a), we now conclude that notice by "actual communication" does denote a subjective standard. "Communication" is defined as "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct," and also as "the process of bringing an idea to another's perception." Communication, Black's Law Dictionary (11th ed. 2019). "Actual" is defined as "[e]xisting in fact; real." Actual, Black's Law Dictionary (11th ed. 2019). Here, the adjective "actual" modifies the noun "communication" to mean that, in fact, a person in lawful possession of a place, or their agent, brought to the perception of another "notice of trespass." This is a subjective standard.

¶ 35. Defendant's subjective perception of communication intended to inform her of trespass is a necessary part of determining whether the State has met its burden as to the notice-by-actual-communication element in § 3705(a)(1)(A). Put differently, defendant cannot knowingly[6] remain in the bar "against . . . notice . . . of trespass . . . by actual communication" if

---

[6] This Court has stated that to " 'knowingly' cause harm is to form a degree of intent to harm that is greater than to 'consciously disregard' the risk that harm may result from the conduct." State v. Trombley, 174 Vt. 459, 461 n.3, 807 A.2d 400, 404 n.3 (2002) (citation omitted). Therefore, "[i]t is evident to us that the . . . concept of . . . knowledge corresponds to the common

15

she did not perceive that communication as notice of trespass. 13 V.S.A. § 3705(a)(1)(A). Because the notice-by-actual-communication element contains a specific-intent component in addition to the act of entering or remaining in a "place," it follows that defendant can argue that she was so intoxicated as to have failed to form the requisite intent to remain in the bar following the bouncer's communication. See State v. Bourn, 2012 VT 71, ¶¶ 10-14, 192 Vt. 270, 58 A.3d 236 (holding that Legislature implied specific intent element in statute and that preclusion of diminished capacity defense at trial was therefore error).

¶ 36. The vast majority of jurisdictions with similar criminal trespass statutes have also concluded that they contain at least some subjective element. See 3 W. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2020) ("Only one criminal trespass statute has been found expressly declaring that it is an absolute liability offense, i.e., one for which no mental state whatsoever is required.") (citation omitted). Indeed, a common feature of these statutes is the requirement that the would-be trespasser "be <u>aware</u> of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability . . . the inadvertent trespasser." <u>Id</u>. (emphasis added) (quotation omitted). A person who is not actually aware of notice when communicated by the appropriate person, as opposed to by posting, and therefore remains against that notice, cannot be guilty of misdemeanor unlawful trespass.

¶ 37. The trial court did not appear to apply a subjective standard to find defendant guilty of unlawful trespass. The court credited the bouncer's testimony that "he instructed [defendant] that she needed to leave the bar, and that she refused to do so, despite his being an employee of the bar with authority to require her to leave." The trial court concluded that "defendant therefore

_____

law concept of specific intent . . . . Both of these concepts import a conscious intent or design to act as charged." <u>Id</u>. (citation omitted).

remained in the bar despite being instructed that she was trespassing and needed to leave."[7] The court, at least, should have considered defendant's actual subjective experience of the encounter with the bouncer; it is not enough to conclude that defendant "refused" to leave the bar without explaining, to some extent, how that related to her state of mind at the time.

¶ 38. Finally, the State's argument that counsel's defense to unlawful trespass did not rely on defendant's mental state is contradicted by the record. As noted above, during closing arguments, defense counsel told the court that, for notice of trespass to be actually communicated, defendant needed "to comprehend" that the bouncer was communicating such notice. Defense counsel expressly requested that the trial court "should infer a mens rea of intent" in the unlawful trespass statute. Moreover, the trial court precluded defense counsel from making an explicit argument that defendant did not actually perceive the bouncer's communication because she could not form the requisite intent due to intoxication. We are satisfied that defense counsel relied, to the extent he was permitted to, on the theory that unlawful trespass, as charged, contains a specific intent element. Therefore, we reverse and remand to the trial court to make further findings and conclusions, consistent with this opinion, based on all the evidence presented at trial.

Reversed and remanded for further findings and conclusions based on all the evidence and otherwise in accordance with this opinion.

FOR THE COURT:

_____

Associate Justice

---

[7] Though the court made findings concerning defendant's interaction with law enforcement while still in the bar, it did not discuss those in the context of its legal conclusions with respect to unlawful trespass.